## The People ex rel. Joseph Workman v. The Board of Education of Detroit.

*Right of attending School: City of Detroit.* An amendment to the general School Law in 1867, Session laws 1867, vol. 1, p. 42, provided that "all residents of any district shall have an equal right to attend any school therein, provided that this shall not prevent the grading of schools according to the intellectual progress of the pupils, to be taught in separate places when expedient."

*Held,* that the provisions of the law of 1867, were of universal application to all the school districts of the state, and that there was no intention on the part of the legislature to make an exception of the city of Detroit.

*City of Detroit: Colored children.* The city of Detroit is not entirely exempted from the operation of the General School Laws, but is subject to such of their provisions as are not inconsistent with the special legislation regulating the city schools.

THE PEOPLE v. THE BOARD OF EDUCATION OF DETROIT.

*Held*, further, that under this law colored children were placed on the same footing with white children, and admissible on the same terms to all schools.

*Mandamus: Public Schools: Right of parent to the writ.* In an application for *mandamus* to compel the admission of a minor child to the public schools, though the proceeding is for the benefit of the child, the father is entitled to assert the right.

*Mandamus: Petition.* When the petitioner failed to shew affirmatively, that the child possessed the necessary qualification; but offered to submit him to the rules and regulations of the board, and was refused on account of his color: *Held*, that the board having made this the sole objection, the relator, should this fail, is presumptively entitled to the writ.

*Heard May 5. Decided May 12.*

*Mandamus* to the Board of Education of the City of Detroit.

It appeared that in April, 1868, the relator duly and properly applied for the admission of his child, a mulatto, of more than one-fourth African blood, into the Duffield Union or Tenth Ward School of the city of Detroit, and was refused.

That, at the time of said application, there was room for relator's child in said school; that at the present time there is room for scholars in said school; that the relator is a mulatto, residing and owning property in the city of Detroit, and paying taxes thereon, including a tax for the support of the primary schools of said city; that said city for many years heretofore has constituted one school district, under the direction and regulation of the Board of Education; that the respondents, many years since, established separate public schools for colored children exclusively, but in all other respects the same as the public schools for the white children, and that there are now two of said schools in operation in said city, one in the fourth and one in the seventh ward thereof, and that another is now being prepared in the sixth ward thereof; that relator's child is not entitled to enter any other grade of school than that to which these colored schools belong; that out of all the colored children in said city, but thirty-eight live in wards distantly removed from said colored school; that there are now vacant sittings in said colored schools to which the relator's

child can be admitted upon proper application; that after the establishment of said colored schools, respondents made a resolution or by-law, requiring all colored children to attend said colored schools, and prohibiting their admission into the white schools of said city; that the regulation and government of the public schools of said city has been for many years past eminently successful, and the behavior of the scholars therein exceedingly conducive to the advantage and prosperity of said schools; that there is a strong prejudice against the colored people among a large majority of the white population of said city, and among many of the children in said schools, and that a careful consideration of the question has convinced respondents that the abolition of said colored schools, and the indiscriminate union and mingling of colored with white children in all the public schools, would be greatly prejudicial to the best interests of said public schools, and would engender strife and discord among the scholars thereof.

*H. M. & W. E. Cheever,* for relator.

The Board of Education of the city are a body corporate, created by special statute, and take the place of the Board of School Inspectors under the general law of the state. To them is committed the direction and regulation of the free schools of the city. The act was passed in 1842, and although various amendments have from time to time been made to it in other particulars, the provisions bearing upon the present case are unchanged. Section one, of the act of 1842, provided that "the city of Detroit shall be considered as one school district, and hereafter all schools organized therein, in pursuance of this act, shall, under the direction and regulations of the board of education, be public and free to all children residing within the limits thereof, between the age of five and seventeen years, inclusive." — *Act of 1842*, § 1.

The act of 1869, now in force, changes this section only in the admission of scholars up to the age of twenty. — *Act of 1869*, § *1*.

The only ground upon which the respondents base their refusal to comply with the requirements of section one of the act is to be found, if it exists, in section nine of the old Act of 1842, as amended in 1850 and 1855, and which is section eight of the Act of 1869. This section gave them "full power and authority to make by-laws and ordinances relative to the regulation of schools, and relative to anything that may advance the interests of education, the good government and prosperity of the free schools in said city, and the welfare of the public concerning the same." — *Act of 1842, p. 114, § 9; Act of 1869, § 8.*

This seems to give a general discretionary power, it is true, and respondents may claim great latitude in the exercise of their powers under it, still they can do nothing which will conflict with the provisions of the act as a whole; they can do nothing which would be manifestly contrary to the intention of the legislature in the enactment as a whole. This intention clearly was to commit the care and custody of the free schools of the city of Detroit to the respondents, instead of a board of school inspectors (as elsewhere in the state), to be by them carried on as nearly as possible in accordance with the general state law, not to be "regulated" in such a way as to be virtually closed against one class of citizens, while open to others. What then, is the meaning of section nine?

(The counsel here entered into a critical examination of the several acts of the legislature, together with the constitutional provisions bearing upon the subject.)

Without section nine, it will not be contended that colored children could be excluded from the nearest school to their homes in the city. Does this section give the respondents the power they claim under it?

This section will be claimed by the respondents as in

the nature of a general authority to legislate upon this question. But granting this, for the argument, their legislation or regulations upon a subject committed to them, must be in conformity, as far as practicable, with the general legislation of the state upon the same subject matter. — *Welch v. Stowell, 2 Doug. 336.*

The object in making the city "one district," was to give the control of all the schools to one corporate body.

By the law of the state, children must attend in the district where they reside. As the city increased, this became inconvenient. A scholar might live across the street from a school-house, and yet be in another district. Hence the necessity of creating one district, and giving the board power to make school "limits" of territory contiguous to the school-house, without regard to ward lines.

A "regulation" requiring children to go from the tenth ward to the ninth, a distance of over two miles, and pass other schools on their way, becomes virtually a prohibition of the benefits of the school system.

Again the Duffield school has its grades; the colored school is a primary school only; and the exclusion of, the the colored child from the union school is an absolute prohibition of an enjoyment of the higher grades of the free schools.

The power to regulate is not the power to prohibit. — *Nagle v. the City of Augusta, 5 Geo. 546; Ex Parte Burnet, 30 Ala. 461; Roberts v. City of Boston, 5 Cush. 198; Clark v. Board of Directors, 24 Iowa, 60: People v. Auditor General, 17 Mich. 175.*

Applying the reasoning in said opinions to this case, the power to regulate should not be confounded with the power to create or change a system as previously fixed by the legislature, both in the general school law of the state, and in the act applicable to this city.

The primary intention of the act is to give free schools to all children in the city, If the construction, contended

for by the respondents, of section eight, be given, does it not, to a certain extent, prevent the schools being free to all ?

*D. B. & H. M. Duffield,* for respondents.

Respondents insist that the relator is not entitled to the *mandamus* prayed, for the following reasons.

1. Because it is at this time impossible for the respondents to comply with it on account of the lack of room in the schools. — *Regina v. The London & N. W. R. W. Co. 6 Eng. R. & C. Cases, 479.*

2. Because the relator has no such interest in the matter as entitles him to ask for a *mandamus.*

The petition should be made by the child excluded, by its next friend. — *Stephenson v. Hall, 14 Barb. 222; Sherman v. Charlestown, 8 Cush. 161; Donahoe v. Richards, 38 Maine, 376.*

3. Because the resolution of respondents requiring colored · children to attend separate schools, established and maintained exclusively for them, is —

*First* — Authorized by statute;

*Second* — An exercise of their discretion, with which this court will not interfere; and,

*Third* — A reasonable regulation "for the good government and prosperity of the free schools of said city."

*a.* This authority is derived from the Act of February 1869, which in express terms repeals all other acts inconsistent therewith.

Section one of said act provides:

"That the city of Detroit shall be considered as one school district, and all schools now organized, and hereafter to be organized therein in pursuance of this act, shall, under the direction and regulations of the board of education, be public and free to all children residing within the limits thereof, etc.

Section eight, gives the said board "full power and authority to make by-laws and ordinances * * * * relative to the regulations of schools, * * * relative to anything whatever that may advance the interests of education, the good government and prosperity of free schools in said city, and the welfare of the public concerning the same."

The resolution of respondents relative to colored schools merely regulates the admission of children to the several schools.

There has been no exclusion of relator's child from the public schools of said city. The return expressly avers that the relator's child can, at any time, upon proper application, be admitted to the colored schools.

The meaning of the act clearly is, that all the city schools shall be public and free to all children living in said city, and that the board of education shall regulate the apportionment and distribution of said children among the several schools of the city.

This power to regulate the system of classification and distribution of the school children must be placed somewhere outside the scholars. The legislature have wisely committed it to respondents, who are citizens of Detroit, and elected by its people, and when it is reasonably exercised by them, we submit their decision must be conclusive.

*b.* The regulation of the system of distribution and classification of children is a deliberative and discretionary act. The jurisdiction of the board is a large and populous city, comprehending many conflicting and antagonistic elements. They are the best judges, and are and should be the sole judges of what is the best method of harmonizing and directing these elements so that they will not clash. — *4 Mich. 104.*

They are, also, a deliberative body, and all their actions and resolves are the result of deliberation, and involve an exercise of their discretion.

There is no specific direction ·how the schools shall be organized, or how they shall be taught, or how many schools there shall be kept, or what shall be the qualifications for admission to the schools. All these matters must be regulated by respondents; and in the regulation thereof they do not act ministerially, but exercise the discretion vested in them by law.

It is well settled that in such a case a *mandamus* will not be granted. — *Moses on Mandamus, p. 78; Spears v. Cummings, 23 Pick. 227; People v. Auditor General, 3 Mich. 427.*

*c.* The exclusion of the colored children from the white schools, is a reasonable regulation "for the good government and prosperity of the free schools of said city."

Under the authority of *Day v. Owen* cited *infra*, we think that this question must be left to a jury.

This regulation is no more unreasonable than one requiring all girls to attend certain schools, and all boys to attend certain others, and this court would not issue a writ commanding respondents to admit a girl to a boy's school, if respondents should in their judgment separate the sexes.

Can it be said to be unreasonable for respondents to separate colored from white children in the public schools as long as stated? *Comp. L. p. 950*, § *3209*, forbids intermarriage between them.

The fact is averred and admitted that there exists among a large majority of the white population of Detroit a strong prejudice, or animosity, against colored people, which is largely transmitted to the children in the schools, and that this feeling would engender quarrels and contention if colored children were admitted to the white schools.

Whether the association together of black and white children in the same schools would not equally foster and engender this prejudice may well be doubted, and as said by Chief Justice *Shaw*, in *Roberts v. Boston*, cited *infra*, is

a fair and proper question for the board of education to consider and decide, having in view the best interests of both classes of children placed under their charge.

The following authorities are analogous. They are actions against carriers for refusing to transport colored persons in the same apartments of their conveyances which the whites use. They hold that the carrier is bound to carry a colored person, but that they have authority to regulate their accommodation, and if they afford them equal accommodations with the whites, then it is a question for the jury whether the regulation is reasonable. — *Day v. Owen, 5 Mich. 520; Jacobs v. Atlantic Nav. Co.* cited from *N. Y. World* of March 11, 1869; Pennsylvania case referred to in above case, of *Jacobs v. A. N. Co.*

The only authority directly bearing upon this question which we have been able to find, is — *Roberts v. Boston, 5 Cush. 198.*

We submit that both upon principle and authority the *mandamus* should be denied.

COOLEY CH. J.

Under the general law of the state, entitled " Of primary schools," the several townships are divided by the township boards of school inspectors into districts, each of which is a corporation, with officers chosen by its members, and with large powers in the establishment and control of schools, the management and disposition of school moneys, and the levying and collection of taxes. These districts generally have a single school house only, and they need only the simple machinery prescribed by the general law for the proper performance of their corporate functions. For the larger towns of the state, it has been deemed necessary to make special regulations; and general and special laws have been passed under which most of the cities and large villages of the state have been made union school districts,

with larger boards for the management of their affairs, larger powers of taxation, and peculiar powers in the grading of the one school, or the several schools which they may establish. In so far as the laws creating these districts establish special regulations for them, or confer special or enlarged powers, they are removed from the control of the general primary school law; but in all other particulars that law still controls, and as school districts they make their reports and receive their primary school moneys under it.

The city of Detroit is one of the towns provided for by special legislation. By an act "relative to free schools in the city of Detroit," passed in 1842, (*S. L. 1842, p. 112*) it was provided that "the city of Detroit shall be considered as one school district," and the control of all schools organized therein was put under the direction and regulations of the board of education therein provided for. Previous to this act, there had been within the city the anomaly of a district within a district; the former including only the colored population; but this was inconsistent with the free school act and was therefore repealed by implication. The free school act has been modified subsequently, and in the present year has been revised throughout; but the city is still declared to be one school district, in the same language we have quoted from the original act.

Such being the division of the state into school districts, the legislature of 1867 passed an act amendatory of the primary school law, one section of which is as follows: "All residents of any district shall have an equal right to attend any school therein: Provided that this shall not prevent the grading of schools according to the intellectual progress of the pupils, to be taught in separate places when deemed expedient." (*S. L. 1867, vol. 1, p. 43.*)

It cannot be seriously urged that with this provision in force, the school board of any district which is subject to

it may make regulations which would exclude any resident of the district from any of its schools, because of race, or color, or religious belief, or personal peculiarities. It is too plain for argument that an equal right to all the schools, irrespective of all such distinctions, was meant to be established.

Does this provision apply to the city of Detroit? That city, as we have seen, is expressly declared to be "one school district," and is, therefore, within the words of the act of 1867. That the legislature seriously intended their declaration of equal right in the schools to be partial in its operation, is hardly probable. But they may, nevertheless, have failed to make it universal, if they have incorporated it in a law from the operation of which some portion of the state is exempted by other laws.

The declaration is incorporated in the general primary school law. I am not aware that there is any organized portion of the state that does not come under some of the provisions of that law. The specially created union school districts are subject to it, except so far as the special legislation creating or governing them is inconsistent. The declaration in the Detroit free school act that the city shall constitute one school district, is idle for any other purpose than to connect the city with the primary school system which the general law establishes, and to give its citizens the advantages, and to require of its officers the performance of such duties as are essential to the harmonious working of the general system within the city. That was undoubtedly its purpose. It is not true, therefore, that the primary school law has no application in the city of Detroit, or that we can say of any of its provisions respecting districts that Detroit is exempt from them, unless we are able to see how those provisions are inconsistent with the free school act, or with any other special legislation that may have established peculiar regulations for that city.

Many things in the free school act clearly refer to the

general law, and require its aid to give them effect. The primary school money and district library money are apportioned under it, and are only received by the city in its capacity of a school district. The free school act provides for reports, but it is the general law which prescribes to what office they shall be sent, and gives the state superintendent a supervisory and directory power in respect to them. The free school act empowers the city board of education to make by-laws and ordinances relative to the taking of a census of children, but this is controlled by the general law which provides that children in almshouses, prisons or asylums, not otherwise residents of the district, and not attending the school, shall not be included in such census, nor shall Indian children be included, unless they attend the school, or their parents are liable to pay taxes in the district.—( *S. L. 1867, vol. 1, p. 43.*) The penalty which the general law imposes on any one who shall wilfully disturb any district or union school, ( *Ibid.*) will protect the schools in Detroit, as well as those in the country. At every point the general law is complementary to the special legislation, and is necessary to give it complete operation. Even the tax which may be levied by the city board for school purposes, is graduated by the number of children within the district, as shown by the report made under the general law. And as all other portions of that law not inconsistent with the free school act, apply to the city of Detroit, so must the section establishing equality of right in the schools apply also, unless it can be shown to be inconsistent. No inconsistency was pointed out on the argument, nor was any reason suggested as likely to have influenced the legislature to make that city an exception.

It is true that the board of education are vested with large powers to make rules and regulations respecting the schools, and the attendance of pupils therein, but this fact alone is not sufficient to show a legislative intention that

they shall be exempted from general regulations like that in question. A general statute regarding graded and high schools empowers the trustees "to classify and grade the scholars in such district, and cause them to be taught in such schools or departments as they may deem expedient; to establish in said district a high school, when ordered by a vote of the district at any annual meeting, and to determine the qualifications for admission to such schools," "and to make such rules and regulations as they may think needful for the government of the schools," (*Sess. L. 1859, p. 447.*) No broader powers than these are conferred upon the Detroit board to make rules and regulations respecting attendance upon schools; and any rule of construction which will confirm to that board the power they claim, will give it also to every board of trustees of a graded or union school district under this law. Yet if we were to look outside the act of 1867 for the occasion of its passage, we should probably find that occasion to exist only in the city of Detroit and in some two or three of the union or graded districts where distinctions based upon color were kept up, which were unknown in the other portions of the state. We might perhaps take notice of the fact that immediately preceding the passage of that act, an application was made to this court for a *mandamus* to compel the trustees of one of the union school districts, embracing the city of Jackson, to admit a colored pupil to the same school with white children, notwithstanding they had established a colored school within the district.

If that application was not the immediate occasion of the legislation in question, it is at least highly probable, that it presented one of the cases which made new legislation appear important; and if the act was not intended to reach the districts which are empowered to make their own regulations, then we shall witness the remarkable spectacle of a law which assumes to prohibit what the

legislature evidently regard as an unjust discrimination, but which is so framed as to reach only those portions of the state where the distinction does not exist, and to exclude from its operation those portions where the legislature is notified that it prevails.

In one particular the section in question is undoubtedly modified in its operation within the city of Detroit, and within every other school district of the state which lawfully establishes more than one school for pupils of the same grade. The fixing of school limits in such case, and the establishment of regulations which shall require children residing within those limits to attend the schools therein, are within the contemplation of the statutes, creating or authorizing the creation of the districts, and are therefore, lawful and proper. But we do not discover that there is anything in any of those statutes—and we include particularly in this statement, the Detroit free school act—that overrules or modifies the requirement of the general law, that the right to attend the schools shall be possessed equally and impartially by all classes of residents.

The conclusion is inevitable, that the legislature designed the impartial rule they established to be of universal application.

It remains to be seen whether there are any formal objections to the writ prayed for. It was suggested by the respondents, that the father, as such, could not apply for a *mandamus* on behalf of his infant child, but that the child should apply by *guardian ad litem.* The father is the natural guardian of the child, charged with his nurture and education, and having a personal duty to perform in respect thereto. Although the proceeding is for the benefit of the child, the duty of placing him in school is the parent's, and the father is entitled on his own behalf to appeal to the courts for the removal of any unlawful impediments. It was also urged, that the application for the writ did not

THE PEOPLE *v.* THE BOARD OF EDUCATION OF DETROIT.

show affirmatively, that the child possessed the necessary qualifications for admission to the school. It shows, however, that the father applied for his admission, and offered to submit him to all the rules, examinations and regulations of the board with regard thereto; and was refused because of the child's color. The board having made this the sole objection, the relator, if this fails, is presumptively entitled to the writ. We think, under the statute, the objection is not valid.

As the statute of 1867 is found to be applicable to the case, it does not become important to consider what would otherwise have been the law.

CHRISTIANCY and GRAVES J J. concurred.

CAMPBELL, J.

The claim of the relator in this case is, that the Board of Education of Detroit cannot lawfully maintain the separate schools for colored children, which have ever since its organization been maintained, and are now kept up in the city, and require them to attend there.

If there is any ground of complaint, the relator is the proper person to bring the case before the court. No one can be more interested than the father of a child in obtaining his school privileges.

The question involved is purely one of law, and cannot properly be allowed to become involved in any complications of policy. If the board of education have the control over the arrangement and classification of the schools, which they have heretofore exercised, their action cannot be judicially revised. If they have exceeded their powers, the excess can be restrained, and the writ applied for is the proper process.

The counsel for relator did not claim upon the argument, that the law of 1867 was applicable to city schools, and we have not, therefore, had the benefit of any full dis-

cussion upon the relation which the city system bears to the general legislation, concerning schools in the ordinary districts, so far as it is affected by this statute.

It seems to me that section 28 of the statute of 1867 is foreign to the inquiry. It is inserted in the middle of that part of the primary school law which relates entirely to the organization of the ordinary districts, and the powers and duties of their officers. The fact that it purports to be an amendment of a section that has not been in existence since 1859, might perhaps bear upon its validity; but it is inserted where it naturally belongs, and while going far enough to prevent discrimination in attendance in the general districts, it was needed for other purposes as well, in those districts. As to them, it covered ground upon which there was no clear legislation; while as to the Detroit schools, the whole subject had been either provided for by legislation, or expressly put in the control of the board. The application to this court for a *mandamus* to admit a colored child to a school in an interior city, had disclosed to the legislature the remarkable fact, that the rights of attendance on district schools had been left almost entirely to depend upon implications which, while possibly within reasonably plain bounds in many respects, had nevertheless given rise to honest doubts and difficulties. In Detroit the school ages were within narrower limits than the census ages, and on the other hand, the schools were all absolutely free to those within those ages, and the classification and arrangement were left entirely to the board, who were bound to do what they could for every one. The absence of some positive provision raised other difficulties than those relating to colored children, and to age and residence. There was one clause giving non-resident tax-payers, who had no schools at home, the right to send their children into districts where they were taxed, which has tended to make some confusion in the popular mind, touching the relative rights of others.

The arguments which have been urged in this case in this court, as well as propounded elsewhere, upon the rights of tax-payers in the schools, might very well have contributed to the propriety of making some more explicit declaration, for no rule of exclusion could be more odious ,and none less likely to be sanctioned, than one which should operate against those, who, from poverty, were most in need of public aid, and in whose training and elevation the community are interested as future voters and citizens. There was for many reasons a necessity for some legislation to prevent these doubts, and confer absolute rights on all children. There was no such necessity in Detroit, for provision had been already made for all children, and the board of education had been entrusted with plenary legislative power, in contriving means and regulations so far as their funds would permit, for best arranging how this should be made effectual. They could do all that the legislature could do in making by-laws and ordinances concerning " anything whatever that may advance the interests of education, the good government and prosperity of the free schools in said city, and the welfare of the public concerning the same."

Upon every usual rule of construction, this 28th section should not be made applicable to any special system where there had been already legislation covering the ground, even if the Detroit school law had in some other respects been dependent on the primary school law. But there is not, so far as I have been able to discover, a single provision of that law from beginning to end, relating to schools and their regulations, which has any such applicability. Even in regard to the school census, the board makes its own by-laws, and deals with none but county and State officers. This census has nothing to do with the regulation of schools, and is not based on attendance, or used in them at all, as a guide to determine who are admissible. It is made to facilitate the distribution of school moneys

derived from the state under the constitution, and of library penalties which belong to towns and cities, except where smaller districts have been allowed for library purposes. These provisions are in no way connected with the management of district school matters, and would be quite as appropriate in any other part of the statutes. But as before stated, the Detroit school law puts the board in direct communication with the county authorities, and regulates their rights and doings very differently from those in the other districts. The suggestion that they are connected with the primary school law by the provisions of section 31, as amended, concerning the punishment of disturbances in public schools, does not appear to me to sustain the connection. That section was originally confined to district meetings, and the amendment was only passed in the same statute with section 28, in 1867. If the Detroit schools were not previously organized under the primary school law, neither of these sections could have any tendency to bring them under it. They must both be regarded as applying to schools under the statute of which they are amendments, and can have no wider scope. The Detroit schools could certainly exist without a provision which was not thought of for more than thirty years after the whole State system had been flourishing, and the board of education has power to pass ordinances on the same subject, and the Recorder's Court has jurisdiction to punish their violation. *School Charter, Secs. 8 and 9.* The offence was also a misdemeanor at common law, according to the best authorities.—*1 Bish. C. L. § 982.*

If it should be suggested that it cannot be presumed different provisions would be permitted among different children in different places, it cannot be denied that these differences have been expressly created by law. Until 1869, the school ages were different in and out of the city. When the census was on the basis of a range of ages from four to eighteen, the city schools were confined by law to the ages between five and seventeen. Since the

change was made, in the state at large, to the term between five and twenty, the old city rule remained unchanged until the present year, when it was made to correspond. The origin of the Detroit school system was had under the very discrimination of color which is now complained of. When the charter was revised and consolidated during the past winter, if the rule giving control to the board had been deemed improper, it would have been rescinded. No one can read the charter, in comparison with the general laws, without seeing that the legislature deemed it wiser to leave a very broad discretion in the board, over the various complications and difficulties incident to a heterogeneous city population, than to require such action as might not be easily undone, should the schools suffer from it. They have given the board a power of local legislation on many school matters entirely exempt from the control of the civil government of the city, and have made them substantially independent of the council in pecuniary matters; one of the last things in which such bodies are usually entrusted with discretionary powers. It cannot be claimed, that the legislature could not make or authorize any regulation they should see fit, in regard to the management of different scholars, and it would be impossible to employ language delegating a larger discretion than they have given to this board.

We cannot avoid seeing, and counsel very frankly admitted, that the force of the relator's claim depends much, if not entirely, upon the effect to be given to a changed condition of public affairs, and whatever corresponding change that condition may have wrought upon public opinion concerning the treatment of colored persons. How far the regulations complained of arose out of any less favorable opinion is not very clear. It is claimed that the rule now enforced is founded on very different considerations, and that the original act of 1841, which first required the separation, was meant to be beneficial, and not invidi-

ous. And I have no doubt such was the fact, although the supposed necessity arose from the state of public sentiment. But whether the policy was, or is, one worthy to be maintained now, is only to be determined by the board, or by the legislature. Public opinion cannot have the force of law, until it is expressed in the forms of law. Courts may or may not appreciate it, but they cannot determine the law by what that opinion is, or by what they suppose it to be. And that the law, which is in this regard unchanged, did originally allow—if it did not require—separate colored schools to be maintained, has never been seriously doubted. In 1841, when the city contained several districts, the inspectors of the city were required to organize a district having no metes and bounds, but composed of all the colored children in the city, within the school ages, and schools were to be kept up separately for their benefit in the city at large. In 1842 the city was made a single district for all purposes; the inspectors were incorporated into a single board, succeeding to the property and liabilities of all the former districts, and given plenary power over the entire management of the schools. The powers given were the same as mentioned in the now existing laws, which are substantial re-enactments. The policy indicated by the legislature of 1841 has been adhered to, and three colored schools have been erected, and are now maintained, in no respect, as the return shows, differing from, or inferior to the other schools. If the law of 1867 repealed any of the former provisions, it might be said that the re-enactment of 1869 restored it; for that is the last enactment. But if the law of 1867 was, as I conceive it to have been, entirely inapplicable, then it had no force one way or the other, and the board of education must act on their own judgment and responsibility in determining how long they should adhere to their present policy; and any change must depend upon their decision.

I think there is no case made for relief.