**Shannon Marguerite HENRY, by Marilyn Ann Henry, her next friend, individually and for all members of her class similarly situated, Plaintiff,**

v.

**Walter GODSELL, Louis H. Schimmel, Lola King, Glenn H. Griffin, Robert Oliver, Monroe Osmun, and J. Allen Parker, individually and as members of the Pontiac School Board, Defendants.**

No. 14769.

United States District Court
E. D. Michigan, S. D.
Aug. 12, 1958.

Milton R. Henry, Pontiac, Mich., for plaintiff.

Harold W. Dudley, Dudley & Patterson, Pontiac, Mich., for defendants.

LEVIN, District Judge.

Plaintiff, a minor and a Negro, by her mother as next friend, brings this action for injunctive relief and damages in behalf of herself and others similarly situated, against the defendant School Board and its members, pursuant to the provisions of the Civil Rights Act, 28 U.S.C. Section 1343, Subsections (1) and (3) [1]. It is her claim that the defendants have violated the Civil Rights Act by maintaining a segregated school system and requiring her to attend a segregated school in violation of the mandate of the Supreme Court. Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 [2].

1. "§ 1343 Civil rights and elective franchise

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

"(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

2. For a scholarly discussion of Brown v. Board of Education and its implications. see Professor Paul G. Kauper, "Segregation in Public Education, The Decline of Plessy v. Ferguson," 52 Michigan Law Review, 1137.

No contention is made that the alleged discrimination is sanctioned by state law which should be declared unconstitutional. Segregation in public schools has been prohibited by statute in Michigan since 1867 [3].

Plaintiff alleges that segregation has been accomplished by constructing a new school in an area occupied almost exclusively by Negroes; by altering and modifying attendance areas so that the population of certain schools is almost exclusively Negro; by establishing a new primary school district which requires her and others to transfer to the new school; and by refusing to permit her to attend a public school of her own choice without regard to the attendance area or district in which she resides.

The defendants admit that a school was built in an area occupied almost exclusively by Negroes; that attendance areas were altered; that a new primary school district was established which required the plaintiff to transfer to the new school; and that she has been refused permission to attend a public school of her own choice; but deny, in all of this, any purpose to establish or maintain a segregated school system.

In addition to the oral testimony of witnesses, more than forty exhibits, consisting of aerial maps, charts, graphs and official records of the school district, were received in evidence; all with reference to population distribution and school districting in the areas with which we are here concerned.

The school district of Pontiac includes the City of Pontiac, Michigan, parts of six adjoining townships, the City of Sylvan Lake and the Village of Lake Angeles. The present estimated population of the City of Pontiac is 85,000 of which Negroes number about 11,000.

The Board of Education, prior to the institution of this suit, did not keep statistics as to the colored and white composition of the school population. At my suggestion, a survey was taken, which reveals that Negro children are enrolled in and are attending 17 out of 31, or over half of the public schools located in the various attendance areas. Provided only that a child's legal residence is within the attendance area prescribed for a school it has been the practice of the Pontiac school district to enroll that child in such school without regard to color. At the present time there is only one high school in the Pontiac school district, and this high school is attended by students of both races. A second high school is now under construction and the school authorities have stated that any student residing in that attendance area will be enrolled.

The enrollment of the Pontiac school district has increased from 13,734 in 1946 to 18,807 in November 1957. It is estimated that by 1965 the school enrollment will nearly double the 1946 enrollment. It is conceded by the plaintiff that the Pontiac school system is overcrowded. To alleviate this overcrowded condition and to provide for the expected growth in school population, the Board of Education authorized the construction of additional schools and the modernization and enlargement of existing facilities. Since 1954 six new schools have been constructed. In 1953, as part of this plan, the Board decided to build a new elementary school to accommodate

3. S.L.1867, Volume I, Page 43, provided in part that: "All residents of any district shall have an equal right to attend any school therein. Provided that this shall not prevent the grading of schools according to the intellectual progress of the pupils, to be taught in separate places when deemed expedient."

In 1869 in People ex rel. Workman v. Board of Education of Detroit, 18 Mich. 400, the Supreme Court of Michigan, speaking through Justice Cooley, held that this act prevented the Board of Education of the City of Detroit from excluding or making any regulation that would exclude any resident of the district from attending any school because of race, color, or creed.

A substantially similar provision is embodied in the present school code. Section 355 of the School Code of 1955, Comp.Laws Supp. 1956, § 340.355, M.S.A. § 15.3355.

the more than capacity enrollment in schools serving the southwest quadrant of the city where by far the largest number of the Negro families is concentrated. Two sites were under consideration for this new school, namely, the so-called "Lake Street" and "Golf Drive" sites.

The Lake Street site, which was ultimately approved, is located in a densely populated area within a radius of half a mile from the homes of the children who attend the school. The children are subjected to no safety hazards in their approach to the school. As a suitable location for a new school, the Golf Drive site suffers by comparison. There is an absence of any sizeable concentration of population near that site. It is located 1.6 miles from the nearest home of the children of the area who need to be served and is separated from the population area to be served by a lake, a large swamp area, and a municipal golf course. There are no streets that directly connect the site and the residences of the children who would attend the school. The site is accessible only by travelling a circuitous route and crossing an arterial highway. The dangers to which children of tender years would have been exposed are readily apparent. On October 13, 1954, the Board decided to build on the Lake Street site. The new school was ready for occupancy at the beginning of the September 1955 term and is now populated almost exclusively by Negro children.

Plaintiff has suggested that the difficulties presented by the Golf Drive site could have been overcome either by building a causeway to provide a direct route to the site or by furnishing transportation between the site and the homes of the children. The Board of Education does not have the authority to construct roads, bridges or sidewalks. To provide transportation services would be costly, requiring the expenditure of funds that are needed to expand educational facilities.

The school board has a duty to provide educational facilities to all children without regard to their color. If it builds schools in areas where need exists, without arbitrarily fixing attendance areas to exclude any given segment of the school population, it is carrying out that duty. It may consider such factors in selecting sites that it considers relevant and reasonable and, in the absence of a showing that the standards for selection are not relevant and reasonable and that in reality they were adopted as a sham or subterfuge to foster segregation, or for any other illegal purpose, their use is within the administrative discretion of the school board. The fact that in a given area a school is populated almost exclusively by the children of a given race is not of itself evidence of discrimination. The choice of a school site based on density of population and geographical considerations such as distance, accessibility, ease of transportation, and other safety considerations, is a permissible exercise of administrative discretion. The selection of the Lake Street school site was based upon these factors and the standards observed were not adopted as a device to circumvent the law.

Plaintiff also alleges that some attendance areas in the school district were altered in 1955 to compel or achieve segregation. This allegation is devoid of merit. The Board of Education has altered and modified attendance areas from time to time to accommodate changes in population and as a result of the erection of new schools and additions to existing schools. The changes in attendance areas that were made in 1955 were in response to the building construction that was then taking place. In the absence of a showing that attendance areas have been arbitrarily fixed or contoured for the purpose of including or excluding families of a particular race, the Board of Education is free to establish such areas for the best utilization of its educational facilities. Michigan Stat-

utes Annotated, Sec. 15.3589 [4]. The evidence establishes that the same permissible considerations that served as a basis for selecting new school sites were employed in fixing school attendance areas.

The plaintiff has no constitutionally guaranteed right to attend a public school outside of the attendance area in which she resides. The utter chaos that would prevail if each child were permitted to choose the school that he or she desired to attend without regard to the attendance area in which the child resides is readily apparent. It was a proper exercise of the Board's power to transfer plaintiff and others similarly situated to the Lake Street school when that school was designated to serve the area resided in by these children.

A few students, because of special circumstances, are permitted to attend a school not in their attendance area. Such permission is granted by the school authorities upon a proper showing, based on their established standards. It conclusively appears from the testimony that the standards applicable for special transfer, which do not include any considerations of race, have been adhered to in every respect.

Nowhere in the record of this case is there any evidence tending to support the plaintiff's claim of a conspiracy to deprive her of her constitutionally guaranteed rights.

The solicitude of the parents of the young child whose rights are asserted here for an education "on equal terms" [5] with all other children has been forcefully presented by her father who appeared as counsel. In view of the serious charges made against those responsible for public education in Pontiac, it is proper to set forth their stated views on the subject of segregation as gleaned from the testimony, and some other pertinent factors of the operation of the Pontiac school system.

Dr. Dana P. Whitmer, the Superintendent of Schools, wrote his doctoral thesis on the problems of inter-group education in the public schools. He said he believes that segregation is inimicable to the democratic way of life. In his testimony before me he stated:

"As a result of my own experience in Pontiac, and in Gary and previously, as well as my own study of this major problem which we face in our country, I feel that segregation, sanctioned in a school district, for example, is both abhorrent and illegal. Certainly if in this country we are to achieve in reality the ideals and principles on which it was founded segregation, which prevents the natural and normal association together of people of varying ethnic, religious and racial backgrounds, must not be sanctioned in this country. And, consequently, in the discussions with the Board of Education of the School District of the City of Pontiac we have attempted continually to take such action as would not segregate the schools."

Glenn H. Griffin, the President of the Board of Education, and other Board members expressed similar views. The record convincingly establishes that the philosophy expressed by those witnesses has been carried into operation by the Pontiac Board of Education. That the policies of the Board of Education were not motivated by racial considerations is attested by the following facts:

The Board of Education employs teachers on the basis of character, competency and training without regard to color. Approximately 10% of the teachers in the school system are Negroes. White and Negro children in the district participate on a non-segregated basis in such day and night school activities as athletics, band, dramatics, debating, school clubs, dances, choruses and festi-

---

4. M.S.A. § 15.3589 provides that "Every board is authorized to establish attendance areas within the school district." Comp.Laws Supp.1956, § 340.589.

5. The quoted words are those of Chief Justice Warren in Brown v. Board of Education.

vals. The 1957 high school varsity football team consisted of 24 Negro members out of a total of 55. White and Negro children mingle freely in lunch rooms and on playgrounds, and in classes for retarded and handicapped children there is no evidence of discrimination as to race.

The plaintiff has failed to present a case for any relief by this Court and an order dismissing the complaint may be submitted for signature. No costs will be allowed.