William G. Easton, J.
This is a proceeding for an injunction brought on by a petition and show cause order. The petitioners are parents of children attending School No. 30 of the City of Rochester, Monroe County, New York, and also representing School No. 30 District Association which is an organization of many parents similarly situated. This matter was referred to me by Special Term, to hear and determine after which an extensive hearing was held.
Because of the failure to serve or present a summons and complaint the proceeding does not constitute an action for declaratory judgment nor is it a taxpayers’ action pursuant to section 51 of the General Municipal Law. Also, it is not a motion for a temporary injunction, for a precise reading of the order to show cause and the petition upon which it was based reveals no mention of relief sought by way of a temporary nature. Mr. Justice Ark refused to grant a temporary stay in the show cause order, the pertinent part of which reads as follows: “ Why an order should not be made and issue herein enjoining and restraining the respondent defendants from proceeding with or carrying out the proposed en masse transfer of students from public school #3 to public school #30 in the City of Rochester, and for such other and further relief as to the Court may seem just and proper ”. While the moving papers are inartistically drawn, yet, in substance they present a request for relief pursuant to article 78 of the Civil Practice Law and Rules which is entitled “ Proceeding against body or officer A proceeding thereunder encompasses relief previously obtained by writs of certiorari, mandamus or prohibition, and it is a proper proceeding to obtain relief on the factual situation here presented. (Queens Vil. Civic Organization v. Board of Educ. of City of N. Y., 14 Misc 2d 546 [1958].)
FACTS
The City of Rochester School District has long been divided into attendance areas or zones, in accordance with long-established practice in the State of New York as well as the fundamental national concept of the neighborhood school system. These area schools were chronologically numbered, generally in the order in which the zones were established. The geographical *477 boundaries were originally drawn without race, color or ethnic origin in mind, and the zones were not drawn or the schools located with a view to producing segregation. Schools Nos. 3 and 30 are involved in this proceeding and are located approximately two and one-half miles apart. By reason of fortuitous residence pattern and population changes over the years, School No. 3 became overwhelmingly nonwhite (95.3%) while No. 30 remained 100% white. In modern day parlance this is called “ racial imbalance ” or de facto segregation which means that the racial imbalance was not__a_pxoduct_of law or even of any school bogjcdls-coiiscious act. It was produced by circumstances. Moreover, there is ncTclaim that either School’ NoTcT or No. 30 was inferior to the other in educational facilities or instruction.
On January 7, 1964 in the middle of the school year, 118 nonwhite pupils comprising all of the fifth and sixth grades in School No. 3 were transferred to School No. 30. No consultation was had with the parents of these children nor was any consent obtained. The school zones are far from being contiguous and the transfer is being made daily by bus transportation. No zone or attendance area lines were redrawn or relocated. Because the children so transferred are far away from their homes, lunchroom facilities had to be provided for them in School No. 30. Such facilities are not furnished the white pupils since they are within walking distance of their homes in the School No. 30 zone. In the morning the white pupils are kept out until the nonwhites are methodically moved in.
Respondents claim that the purpose of this wholesale transfer of 118 nonwhites out of their home area, as announced in the resolution authorizing the move was solely and exclusively because of overcrowded conditions in School No. 3. It was equally persistently maintained by the respondents that integration or racial imbalance was not discussed, thought of, or even mentioned by the Board of Education or its staff in any of their preliminary meetings either public or in executive session. To the contrary, the petitioners contend that the transfer was made because of and to cure racial imbalance in these schools, or at least that it was a major factor behind the move.
As part and parcel of this transfer the teachers were also taken along and these 118 nonwhites were deliberately commingled or integrated with an equal number of white pupils in the same grades. So that, some children in each grade had a permanent change of teacher in the middle of the school year. There was substantial testimony that the fusion of these classes *478 was arbitrarily made according to rows or according to alphabet. Some white and nonwhite pupils were ultimately in each fifth and sixth-grade classes. Respondents do not deny this result but do deny that it was integration. They claim that it amounted to a regrouping of classes and that it was based on educational standards as revealed by achievement tests, etc. Just how or when these tests were given was not explained. Other testimony revealed that the nonwhites had not reached the same point or level of class progress as the whites, which led to confusion and retardation of some of the white pupils. Several School No. 30 children told how their curriculum was changed requiring them to review certain courses of study while waiting for School No. 3 children to catch up. Prior to the change, the children were using different textbooks in the two schools in some courses. The regrouping necessitated that some children would have to use a different text. In addition, there was uncontroverted testimony to the effect that some No. 30 children were emotionally depressed following the regrouping. Because they were unable to readily adjust to the change of status quo a few children were apparently upset by being regrouped in the middle of the school year with children who were not their neighborhood playmates and with whom they had little in common.
Prior to the transfer there were seven vacant rooms in School No. 30 which it was admitted would have easily accommodated the 118 nonwhite pupils so transferred, if overcrowding had been the sole motive. Furthermore, the transfer left five vacant classrooms in School No. 3. For many years the facilities of School No. 3 had been augmented or supplemented by the use of three transportable school buildings, each building containing two classrooms and being adjacent to the original schoolhouse. This was not the only district in which transportables were in use. These three transportables in School No. 3 were abandoned for the school year 1963-1964. Also, for the past two years the Board of Education had remodeled and rented space in the Immaculate Conception (Parochial) School which was across the street from School No. 3. This facility was also abandoned. There was no testimony indicating that these additional facilities had to be abandoned or for what reason. The record shows that there are three empty classrooms available in School No. 17, which was contiguous to School No. 3, the schoolhouses being 1.4 miles apart and that there was one room available in School No. 21, the schoolhouse being 1.95 miles away, so that, at least four empty classrooms were available in two school zones and schoolhouses much nearer than School No. 30 and one of which was contiguous to School Zone No. 3.
*479 Another significant factor bearing on the question of motive in making this transfer was the comprehensive report entitled “ Racial Imbalance in the Rochester Public Schools ” submitted by the respondents to the State Commissioner of Education under date of September 1, 1963. This report contained an analysis of the problem of de facto segregation, the policy of the respondents, and administrative proposals under study. Referring to School No. 3 the report said in part as follows at page 27:
“ (5) closing no. 3 school. The Board of Education and the administration are studying the possibility of closing school No. 3 (95.3% non-white) which is over fifty years old. This closing might be done entirely in one year or over a five-year period. Students from School No. 3 would be assigned and transported to schools where vacant rooms exist and where the percentages of non-whites in attendance are low. The new transportation contract with the Rochester Transit Company provides for free transportation for students living over a mile and one-half from school.
‘1 Implementing this plan over a five-year period (Feb., 1964-Jan., 1969) would involve the following steps:
“A. At the beginning of the new transportation contract with the Rochester Transit Company (Dec., 1963 or earlier), transfer first graders from No. 3 to other schools with vacant rooms and low percentages of non-white .students.
“ B. Each succeeding September, incoming first graders will follow the 1963-64 pioneer group to other schools.
“ C. When the last class of remaining students have completed the 6th grade (JHS plan should by that date accommodate 7th graders), dose No. 3 School.
‘ ‘ D. During the interim transfer period, building maintenance at No. 3 is to be kept up to standard, but large sums of money for refurbishing the building will not be approved.
‘ ‘ E. For possible transfer of students beyond first grade from No. 3, see master plan on open enrollment, page 29.”
In spite of this report and widespread public controversy at the time, the respondents’ witnesses in answer to pointed questions were evasive and refused to use the word “ integration ” or answer a question in which that word was used. They chose to use the word “ regrouping ”. This argument between petitioners’ counsel and the respondents’ witnesses developed into a question of semantics. Webster’s Dictionary defines the word integration ‘1 to combine; to form a more complete harmonious or more coordinated entity, to unite (as a part or element) with something else: to combine together ”. So that integration *480 was actually accomplished by this transfer whether it be called regrouping or by any other name.
From the record and all the testimony given, this court is not impressed by the position taken by the respondents that the controversial transfer was made solely and exclusively from a desire to alleviate overcrowding in School No. 3. It is incredible. That it was a plan to cure racial imbalance is objectively obvious beyond the possibility of other explanation. Their protestations that the sole intent was to relieve overcrowding gives rise to an inference that they feared the controversial transfer would be held illegal if made to cure racial imbalance. Far better had respondents frankly admitted the desire to integrate, for the motive is of little consequence. The respondents are presumed to have intended the actual result which was accomplished and that is of supreme importance in this proceeding.
As a finding of fact, this court holds that the curing of racial imbalance or integration was the reason for the controversial transfer of the nonwhite students from School No. 3 to School No. 30 which was 100% white and that overcrowding was not a basis for the transfer.
LAW
I
STANDING OS’ PETITIONEES
The “ standing” of petitioners to bring this proceeding is the first point to be considered on the law. Respondents make two contentions, first, that before this proceeding could be instituted, an appeal to the Commissioner of Education at Albany, New York, should have been perfected pursuant to the provision of .section 310 of the Education Law, and second, that in any event the petitioners are not persons “ aggrieved ” or “ affected by ” or “ interested in ’ ’ the action of the Board of Education complained of. Treating these contentions in the order above recited, the moving papers claim a violation of the Fourteenth Amendment of the United States Constitution and section 11 of article I of the New York State Constitution and section 3201 of the Education Law. When such questions are raised the appeal remedy to the Commissioner of Education is not an exclusive and mandatory first procedure. (Matter of O’Connor v. Emerson, 196 App. Div. 807, affd. 232 N. Y. 561 [1921] ; Matter of Golden v. Hamilton, 171 Misc. 1039 [1939]; Matter of Frankle v. Board of Educ. of City of N. Y., 285 N. Y. 541 [1941]; Matter of Cantor v. Board of Educ., 262 App. Div. 861 [1941]; Matter of Leone v. Hunter, 21 Misc 2d 750 [1959]; Matter of Balaban v. Board of Educ. of City of N. Y., 40 Misc 2d 249, revd. 20 *481 A D 2d 438.) Respondents cite a decision by Mr. Justice Lambíase (Guariglia v. DEe Furio, 34 Misc 2d 200 [1962]) as supporting their contention that this matter should have first been appealed to the Commissioner of Education. This case does not sustain that proposition since the decision was confined to the question of a school election on a bond issue and there is a separate provision in the Education Law which specifically mandates an appeal to the Commissioner of Education on questions of school elections (Education Law, § 2037).
This court holds that it was not necessary for the petitioners herein to first prosecute an appeal to the Commissioner of Education of the State of New York pursuant to section 310 of the Education Law.
With reference to the respondents’ second contention that the petitioners are not persons “ aggrieved ” within the meaning of the word, enabling them to bring this proceeding, it is difficult to perceive who would be ‘ ‘ aggrieved ”, “ interested in ” or “affected by ” a controversial transfer of the students from School No. 3 to School No. 30 unless it were either the parents of children so transferred or the parents of children attending School No. 30 to which the transfer was made. A significant number of School No. 30 children were adversely affected by the transfer and could be expected to suffer some degree of hardship. The petitioners have a personal interest in the outcome of this proceeding which is a matter of extreme public interest, evidence of which need not be summarized in this decision.
Article 78 in and of itself does not limit the bringing of the special proceeding to a party aggrieved. This limitation, if indeed there is such, has been developed by case law or imposed by different statutes governing particular subject matters. For example, subdivision 7 of section 267 of the Town Law relative to zoning, specifically authorizes recourse to the courts from decisions of zoning boards or other town officials by ‘ ‘ Any person or persons, jointly or severally aggrieved by any decision ” (italics added). Also, related to the case at bar, if petitioners had first appealed to the State Commissioner of Education pursuant to the provisons of section 310 of the Education Law they would have had to qualify as 11 any person conceiving himself aggrieved” (italics added). Many other instances could be cited where specific statutes limit an appeal to a person aggrieved. While this court has been unable to find a decisionprecisely in point on this exact state of facts, either in New York Sate or elsewhere, yet, there are many decisions and law review articles which point the way and show the extreme liberality of the courts in alloAving parties to bring *482 such special proceedings even though their personal interests would be thought to be very remote. This is especially true where the matter involves subjects of public interest and requires interpretation of statutes and Constitutions.
Matter of Andresen v. Rice (277 N. Y. 271 [1938]). Proceeding to compel State officials to perform duties provided by the Civil Service Law relative to police examinations. The court said (p. 281): “ The point has been raised that the petitioner here is not capable of presenting this matter to the court, as he has not applied for a position on the force. He is of age to make such application, but, more than that, he is a citizen and resident of the State of New York, and, being such, is capable of presenting to the courts his petition for the enforcement by officials of their mandatory duties [cases cited] ”.
Matter of Kuhn v. Curran (294 N. Y. 207 [1945]). (A new judicial district was created. Petitioner was a resident in a county, part of the proposed new judicial district. In view of the public importance of the determination of constitutionality the court did not pause to consider whether the question was presented in appropriate proceedings.)
Matter of Board of Educ. v. Wilson (282 App. Div. 821 [1953], mot. for iv. to opp. den. 306 N. Y. 983). (A new central school district was laid out including therein a portion of the old school district in which the petitioner resided. Article 78 proceeding appropriately brought.)
Matter of Libby v. Angevine (17 Misc 2d 80 [1959], affd. 8 A D 2d 474). (Article 78 proceeding by property owners in a residential zone against granting of permit for nonresidential use therein — petitioners’ properties were several hundred feet high up on a bluff above and westerly of the bay and nearest residents of petitioner about one quarter of a mile from the premises affected. Neither could be seen from the other. It was urged that the petitioners did not show facts sufficient to establish that they were aggrieved and entitled to maintain the proceeding. The objection was overruled and the court said [p. 82]: “ Petitioners live in this residential zone and have the right to be heard with respect to any official change therein amounting to a relaxation of the limitations on the permitted uses ”. [Town Law, § 267, subd. 7].)
Matter of McDonough v. Board of Education (20 Misc 2d 98 [1959]). (A Board of Education awarded two printing contracts without advertising for bids, contrary to law. Petitioner was the owper of a newspaper. The statute did not provide that advertisement for bids should be done in a newspaper. The *483 court held that the petitioner was not disqualified from bringing a proceeding in a legalistic sense and said [pp. 99-100]: “ The proper advertising for bids and the letting of contracts, as provided by the law above set forth, is a matter of public interest. Under such circumstances, it is neither necessary for the petitioner to show that he is an aggrieved party nor that he has any special interest. [See 22 Carmody-Wait, New York Practice, §§ 310, 313 and cases cited.] ”)
Matter of Vetere v. Allen (41 Misc 2d 200). This decision of Mr. Justice Isadore Bookstein in the so-called “ Málveme ” case involved an article 78 proceeding under the Civil Practice Law and Buies to review the determination and order of the State Commissioner of Education ordering transfers of pupils from schools in their attendance area zones within a school district for purposes of eliminating de facto racial imbalance, resulting from incidents of residence. The text of the decision does not reveal who the petitioners were, except that in the title to the proceeding they were named as residents and taxpayers of the school district. The decision applied generally to the situation where the local Board of Education had been ordered to redraw attendance area lines within a school district which was alluded to as a “ gerrymandering of attendance area zones ”, for the purpose of eliminating racial imbalance. There was a shifting of both white and nonwhite pupils into three new zones so created that there would be a more equal balance of races in each zone regardless of proximity of residence of the pupils to the schoolhouses. The entire school district contained three elementary schools located in attendance zones of long standing. Due to a substantial increase in Negro residents in one of the school zones there became a large attendance of Negro pupils in that schoolhouse approximating a ratio of 75%. The board had required 224 nonwhite pupils to be cross-transferred to the other two schools and 174 white pupils to be transferred to the Negro area school. The question of the “ standing ” of the petitioners to bring the proceeding or their status as interested or aggrieved parties was not treated or even mentioned by Justice BoonsTsm. No matter who the petitioners were, be they white or nonwhite, apparently they were presumed to be interested parties and it is a matter of common knowledge that the decision was of wide public interest throughout the State of New York and elsewhere. If an act by a public body is illegal or unconstitutional and it is a matter of extreme public interest, which the case at bar certainly is, the courts will review the matter at the instance of almost any citizen. For a recent comprehensive treatment of the question of *484 ‘ ‘ Standing to Secure Judicial Review ” especially in public actions, see Harvard Law Review (vol. 74, pp. 1265-1307 [May, 1961]); Harvard Law Review (vol. 76, pp. 25-27 [Nov., 1962]). The United States Supreme Court in Zorach v. Clauson (343 U. S. 306 [1952]) (released time for religious instruction); Engel v. Vitale (370 U. S. 421 [1962]) (school prayer case) and Arlington School Dist. v. Schempp (374 U. S. 203 [1963]) (bible reading) has demonstrated what very little, if any, conventional standing a petitioner must have in order to secure constitutional interpretation. In all of these cases the petitioners were parents of pupils in public schools without proof that any child had protested or had been discontented.
There is not the slightest doubt but that the petitioners herein are parties aggrieved and especially interested in and affected by the transfer ordered by the respondents, subject of this proceeding, and hence, are properly before this court.
II
SECTION 3201 or THE education law
Section 3201 of the Education Law of the State of New York reads as follows: No person shall be refused admission into or be excluded from any public school in the State of New York on account of race, creed, color or national origin ’ ’. The historical background and development of this statute has been very adequately covered in the “ Málveme ” and Balaban decisions {supra). The “ Málveme ” decision was based exclusively on a holding that the order of the State Commissioner of Education violated this ! section 3201 and the determination of the Commissioner was therefore annulled. The question of constitutionality was not considered. The only difference between “ Málveme ” and the case at bar is that in “ Málveme ” both whites and nonwhites were ordered to be cross-transferred away from the schools nearest their places of residence all within one school district, for the express purpose of curing racial imbalance, whereas, in the case at bar only nonwhite pupils were transferred away from their home school. This was clearly a violation of section 3201 which, upon application of any of the parents of these nonwhite children, could have been stopped immediately. At any rate, it is subject to judicial intervention. As Justice Bookstein said (p. 206): “ Irrespective of whether the pupils be white or Negro, it would certainly seem that admission on such a basis is predicated on race or color. Admission so predicated, even though intended <o alter racial imbalance, nonetheless violates the language of the statute ”.
*485 However, in the case at bar, petitioners’ children have not been refused admission into or excluded from their neighborhood school nor have they been transferred. So the precise question is, may persons other than the transferees or their parents bring an action to enjoin a violation of this statute? The answer must be yes, for to hold otherwise would mean that all other parents and residents of the district would be powerless to complain about the violation, and a school board conceivably could transfer all of the nonwhite children out of their tie facto segregated schools throughout the city and abandon those schoolhouses entirely.
It has been said that the parents of the nonwhites so transferred are not here protesting even though their formal consent was not obtained. The statute makes no mention that the refusal or exclusion has to be without consent or without protest. It simply prohibits the act of refusal or exclusion on the basis of race, creed, color or national origin. Therefore, the statute has been violated and the resolution of the respondents authorizing and directing the transfer could be annulled on this basis alone.
Ill
CONSTITUTIONALITY
Petitioners assert a violation of the Constitution of the State of New York (art. I, § 11) and the Fourteenth Amendment of the United States Constitution. These constitutional guarantees mean that a nonwhite pupil has just as much right to be educated in a public school as a white pupil, but it also means, and equally so, that a child should not be enrolled or transported to a certain schoolhouse because he is white or nonwhite. To apply such a test, overtly or covertly, is reverse discrimination making racial membership a qualification for such a move, when it really should be irrelevant and immaterial. The children so transferred from School No. 3 to School No. 30 had no constitutional guaranteed right to attend Public School No. 30 which was outside of their attendance area in which they resided. It was an unconstitutional exercise of power by the Board of Education. (Henry v. Godsell, 165 F. Supp. 87 [1958]; Bell v. School City of Gary, 213 F. Supp. 819, affd. 324 F. 2d 209 [1963] ; Matter of Balaban v. Board of Educ., supra.) These cases recognize the landmark decision of Brown v. Board of Educ. (347 U. S. 483 [1954], 349 U. S. 294 [1955]), by holding that a child has no constitutional guaranteed right to attend a public school outside of the attendance area in which he or she resides. In the Henry case the court refused the plaintiff’s application to be allowed to attend a public school of her own *486 choice without regard to the attendance area or district in which she resided, and the court said in part (p. 91): “ The utter chaos that would prevail if each child were permitted to choose the school that he or she desired to attend without regard to the attendance area in which the child resides is readily apparent ’ \
The Bell case involved an action for declaratory judgment brought by Negro children charging that the respondents City of Gary maintained a segregated school system in violation of their constitutional rights. The court held that the School Board had no affirmative duty to balance the races in various schools under its jurisdiction regardless of residence of the pupils involved. In distinguishing the Brown case in its application to the facts in the Bell case, the court said (p. 829): “ The neighborhood school which served the students within a prescribed district is a long and well established institution in American public school education. It is almost universally used, particularly in the larger school systems. It has many social, cultural and administrative advantages which are apparent without ¿numeration. With the use of the neighborhood school districts in any school system with a large and expanding percentage of Negro population, it is almost inevitable that a racial imbalance will result in certain schools. Nevertheless, I have seen nothing in the many cases dealing with the segregation problem which leads me to believe that the law requires that a school system developed on the neighborhood school plan, honestly and conscientiously constructed with no intention or purpose to segregate the races must be destroyed or abandoned because the resulting effect is to have a racial imbalance in certain schools where the district is populated almost entirely by Negroes or whites. On the other hand, there are many expressions to the contrary, and these expressions lead me to believe that racial balance in our public schools is not constitutionally mandated.” And further at page 831: “ Moreover, the administrative problem of choosing those who would be transferred and those who would not in a rapidly growing school system where the racial complexion of the various neighborhoods is constantly changing would be almost impossible to solve.”
This court feels indeed fortunate to have the benefit of the decision of the Appellate "Division, Second Judicial Department (20 A D 2d 438) dated March 10, 1964, in its reversal of the Balaban case (40 Misc 2d 249 [1963]). The exact holding of the Second Department was that in drawing attendance lines for a new school it is within the power of the School Board to *487 take into consideration the ethnic composition of the children therein in order to prevent the deliberate creation of a segregated public school. In that case, a new junior high school known as “J.H.S. 275” was constructed in a newly created attendance zone or area which involved a transfer to that newly created zone of a 12-block area. The petitioners were 51 white children living in that area who were entering junior high school for the first time and whose homes were nearest to this new J.H.S. 275 as compared to any other junior high school. At page 441 of the decision, the court said in part as follows:
“In determining the validity of the board’s zone, the following factors are considered significant:
“ (a) No children residing in another school zone are 1 bussed ’ into J.H.S. 275;
% # ifc
“ (c) Most of the children in the 12-block disputed area live closer to J.H.S. 275 than to J.H.S. 285, and no child lives further from J.H.S. 275 than from J.H.S. 285;
“ (d) All the children in the disputed area live within walking distance of J.H.S. 275;
“ (e) J.H.S. 275 was to be opened September, 1963 with only seventh grade pupils;
“ (f) None of the 51 children here involved had ever before gone to any other junior high school;
“ (g) Those children living within the disputed area who were already attending another junior high school were not being transferred to J.H.S. 275 ”.
At page 443, the court said further: 1 ‘ The Board of Education has the statutory power to select the site for the erection of a new school (Education Law, § 2556), and to determine the school which each pupil shall attend (Education Law, § 2503, subd. 4, par. d). Consistent with the exercise of such power by the board, each child has the right to attend only the public school in the zone or district in which he resides (Education Law, § 3203, subd. 1); and in our opinion, this means the school nearest to his home.”
And further, at page 446: ‘ ‘ Therefore, the desegregation required by the Constitution, as interpreted by the Brown cases, does not mean that there must be an intermingling of the races in all school districts. * * * It does not meam, for example, that white children who live in noncontiguous or outlying areas must he ‘ bussed ’ into a Negro area in order to desegregate a Negro school.”
It follows therefore, and it is the holding of this court that the Brown case also does not mean that Negro children who *488 live in a noncontiguous area mu-st be bussed into a ivhite area in order to desegregate a white school.
Balaban distinguished the cases of Taylor v. Board of Educ. of City of N. 7. (191 F. Supp. 181, alfd. 294 F. 2d 36, cert. den. 368 U. S. 940) and Clemons v. Board of Educ. of Hillsboro (228 F. 2d 853, cert. den. 350 U. S. 1006) by pointing out that in both of those eases there were holdings that a school zone had been artificially gerrymandered to purposely achieve and maintain a segregated Negro school. Obviously, those decisions in Taylor and Clemons were correct and proper on the factual situations as found.
In the Balaban opinion, the court said further at page 449, as follows: “Once the geographic boundaries (or zone) for attendance at J.H.S. 275 are prescribed, every child residing in that zone, if he has the necessary educational qualifications, may go to that junior high school, regardless of race or color and without any limitation as to percentage or number of qualified pupils of his own or any other race or color. In actual operation, it is impossible to maintain and preserve the original ethnic composition, and there never was any intent to do so.” (Italics added.)
And, at page 449: “Of course, the general powers of the board with respect to attendance zones are subject to the constitutional guarantees of equal protection and due process.”
Respondents cite the case of Blocker v. Board of Educ. of Manhassei (226 F. ‘Supp. 208). This case, in view of the subsequent Balaban decision, is of little significance. Furthermore, the opinion in the Blocker case specifically excluded from its consideration a situation such as we have in the case at bar and said in part: ‘ ‘ There is not presented here the question as to whether or not such compulsive distribution, though not required, may be permitted under the constitution or by state law ’ ’.
It is interesting to note that in the currently proposed Civil Rights Act of 1963 (HR 7152, 88th Cong.) now being debated in Congress, its provisions will not force school children to take buses to schools outside their neighborhoods. Instead, the bill forbids the Federal Government from attempting to balance schools racially through assignment plans. It is common knowledge that such a provision was eliminated from the original bill at the insistence of the United States Attorney General because of a fear that it would be unconstitutional.
The pupils of School No. 3 had a constitutional right to attend that school which was nearest their homes as compared with the location of School No. 30 which was two and one-half miles away. The children of School No. 30 have an equal right to *489 attend the school nearest their homes uninterrupted and undisturbed by an arbitrarily forced infusion of some other ethnic group living two and one-half miles away. In their anxiety to cure racial imbalance, respondents have invaded the equal rights of the petitioners. As the court finally said in the Bell case (213 F. Supp. 819, 831, supra): ‘ ‘ Furthermore, requiring certain students to leave their neighborhood and friends and be transferred to another school miles away, while other students, similarly situated, remained in the neighborhood school, simply for the purpose of balancing the races in the various schools would in my opinion be indeed a violation of the equal protection clause of the Fourteenth Amendment.”
COXCLTJSIOX
This transfer by bus of 118 nonwhite pupils from School No. 3 far away from their homes to School No. 30 (all white), in the middle of the school year was ill-timed and ill-advised. It was an arbitrary act and far exceeded the bounds of sound discretion. It was only such action as might have been taken in an emergency, but no emergency existed. The acts of a school board, like the acts of many other legal boards or commissions or authorities, are reviewable by the courts and if found to be arbitrary or capricious, they may be set aside and enjoined.
The neighborhood school is a tenet of American educational faith which could scarcely be held unconstitutional, and indeed, never has been (64 Col. L. Rev., p. 217 et seq., School Segregation). Even with free choice, most children of whatever race, creed, color or national origin, tend to choose the neighborhood school (U. S. Commission on Civil Rights Report, Education II, 1961). While segregation (not racial imbalance) in our schools by law or in fact, is to be abhorred, it is detrimental to both Negro and white children to uproot them from their communities and haul them from one school to another in order to force integration in an artificia] and unworkable manner. Wholesale shifts (such as in this case) are harmful to both white and nonwhite. That innocent children of any race should be used as pawns in these weird sociological chess games is nothing short of reprehensible.
Petitioners are entitled to constitutional protection against arbitrary action. A board of education may not, under the guise of alleviating overcrowding, ignore constitutional rights. It has been said that the Fourteenth Amendment is “ color blind ”, like the proverbial scales of justice. It protects equally the rights of all races, creeds or ethnic groups. Preferential treatment demands a departure from the ideal which judges individ *490 uals by their own merits rather than by affiliations. The Fourteenth Amendment does not tolerate this. ‘ ‘ Positive integration”, the so-called answer to cle facto segregation, sacrifices important communal values imbedded in the neighborhood and in the ethnic institutions within which Americans have organized their urban life. It threatens to reduce an individual to an integer to be shuffled about by authority without reference to his own preference or other ties of family and other social grouping. Equality in education, housing, employment and politics is the true goal, and genuine progress in that direction will push the current problem of cle facto segregation to the background, as it has for other ethnic groups who have retained their character and identity and still are equal. Our law and our courts must not become mere extensions of sociologists’ workshops. Our citizens must remain free individuals and liberty must not be subordinated to equality.
The petitioners’ motion to enjoin and restrain the respondents from proceeding with or carrying out the transfer of students from Public School No. 3 to Public School No. 30 is granted and the determination of the Board of Education to that end is annulled.