**Donald DAVIS, Jr., a Minor by his mother and next friend, Mrs. Sadie Davis, et al., Plaintiffs,**

**v.**

**SCHOOL DISTRICT OF the CITY OF PONTIAC, INC., et al., Defendants.**

Civ. A. No. 32392.

United States District Court,
E. D. Michigan, S. D.

Feb. 17, 1970.

William Waterman and Elbert L. Hatchett, Pontiac, Mich., for plaintiffs.

Harold W. Dudley, Pontiac, Mich., for defendants.

## MEMORANDUM OPINION

KEITH, District Judge.

Plaintiffs in this action, Negro children of the state of Michigan and residents of the City of Pontiac, bring this action, through their next friends and parents pursuant to F.R.Civ.P. 17(c) as a class action as prescribed by F.R.Civ. P. 23(a) and 23(b) (2) (3), against defendants School District of the City of Pontiac, its Superintendent and Assistant Superintendents and the seven members of the Pontiac Board of Education.

Plaintiffs complain that defendants individually and in concert have been and are discriminating against them and denying and will continue to deny plaintiffs and the class they represent the right to be educated in the Pontiac School System under the same and equal terms as white minor residents. Plaintiffs further complain that defendants have discriminated in their hiring and assignment policies of teachers and administrators, and have invidiously considered race in assigning personnel to schools. It is the contention of plaintiffs that the above enumerated practices deprive plaintiffs of rights and privileges secured by the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution. Jurisdiction of this Court is invoked pursuant to Title 28 U.S.C. §§ 1331 and 1343(3) (4); the cause of action is brought pursuant to Title 42 U.S.C. §§ 1981 and 1983.

## CONTENTION OF PARTIES

It is the contention of plaintiffs in this matter that defendants "have drawn the zone attendance lines for elementary schools which have as their purpose and/or effect the maintenance of separate schools for Negro children." (Plaintiffs' complaint.) Plaintiffs contend that the elementary, secondary and high schools within the City of Pontiac operate under a system of *de facto* segregation which has resulted from defendants' policy of shifting boundary lines and locating new schools in such a manner as to minimize the prospect of achieving maximum integrated schools. Plaintiffs assert that the racial integration policies adopted by the Pontiac Board of Education have not been pursued in good faith by the administration, but rather that the actual policy of the board has been and is knowingly to permit the existence of segregated facilities when such could have been and could be avoided. Plaintiffs further assert that it was and continues to be the policy of the Board intentionally to place Negro instructional personnel and principals mainly in pre-

dominately Negro schools and, in addition, to limit the number of Negro employees in proportion to the existing demand for personnel in predominately Negro schools.

It is the position of defendants in this matter that historically the policy of the Board of Education has been that all pupils in the school district should attend the school which services the attendance area in which they live i. e., the "neighborhood school concept" without regard to race or color. This policy became expressed and was reaffirmed by a written resolution of the Board of Education on March 10, 1960. It is the contention of the defendants that the criteria for establishing attendance areas includes the nearness of the pupils to the schools, the safety of access routes, and the capacity of the schools. In 1964, an additional factor was added to these criteria, namely that "when possible" the attendance areas would be drawn so as to provide integration of the student bodies, and that integration would be a factor considered in the selection of sites for the location of new schools.

In regard to the faculties of the various schools, the defendants state that under the provisions of the negotiated contract between the Board of Education and the Pontiac Educational Association (which latter organization is exclusive bargaining representative for all teachers in the school district) transfers and changes in teaching assignments are on a voluntary basis whenever possible. In making involuntary assignments and transfers, the convenience and wishes of the individual teacher are to be considered and only after notification to the teacher, and an opportunity for the teacher to be consulted regarding the transfer may an involuntary assignment and transfer be ordered by the Board.

It is the position of defendants that school activities have always been open to all students irrespective of race, color or creed. Defendants admit the exist-

ence of a racial imbalance, but argue that such imbalance results not because of defendants policies or actions, but in spite of them—a direct result of the segregated housing pattern within the City of Pontiac. Defendants contend that true *de facto* segregation exists in certain of the elementary schools in Pontiac but that the defendants are under no Constitutional duty to undo that which it has not caused.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

The defendants in this action admit that segregation and racial imbalance exists in the Pontiac School System, and that such a situation is directly harmful to the development of those Negro children who suffer thereunder. The Court begins its decision in this matter confronted with the undisputed fact that Negro children are being deprived of quality education in the Pontiac School System and that early deprivation of innocent young children culminates in permanent, devastating, irreparable harm—harm incapable of subsequent correction. Officials of the Pontiac School System admit that these Black children are being given an inferior education, psychologically damaging to their self-image and economically damaging to their ability to perform in an adult world. To a child, segregation "reinforces the idea that he is different, separate and inferior" * * * and the cause of that segregation is irrelevant "as it would make no difference whether it be *de jure* or whether it be by circumstance * * * *de facto*", (Mr. Perdue P. 128)* the harm remains. And so, we observe a generation of children being injured by an admittedly segregated school situation—another generation receiving inferior educations and being deprived of the technical and intellectual skills that will enable them upon graduation to perform in significant positions competent-

* Mr. John Perdue, Director of School, Community and Human Relations, Pontiac School District.

ly and confidently. No expert need explain that frustrations such as these are often manifested in new forms of both anti-social and self-destructive behavior.

Defendants deny any responsibility for the segregated character of their schools, and argue that they have no affirmative duty to rectify a condition which they neither created nor advanced. It therefore becomes the duty of this Court to sift through the maze of incidents which contributed to the present situation; and, inasmuch as segregation admittedly exists in the school system it must be determined if and where failures or omissions on the part of defendants may have occurred and what, if anything, now can be done to halt the furtherance of an abhorrent situation for which no one admits responsibility or wishes to accept the blame. It is neither the Court's intent nor desire to place blame—that belongs to history; it is the Court's obligation and indeed its duty, where the well-being of an entire generation of children is admittedly in jeopardy, to ascertain where duty lies, if a breach of same exists or has existed, and if so, what now can be done to correct the situation.

Beginning as early as 1948, the Pontiac Board of Education unanimously recognized and adopted a policy of hiring "without regard to race or color." (See Defendants' Exhibit 8). In 1954, the Board resolved that "specific boundaries shall be established for each school in the Pontiac School District" (Defendants' Exhibit 2) and publicly declared:

"Whereas, the Board of Education of the School District of the City of Pontiac is faced with the need for an extensive program of school building construction in order to adequately provide educational opportunities for the children of this city; and

Whereas, it has been the practice of the Board of Education of the School District of the City of Pontiac to construct schools in terms of the location of children to be served by those schools irrespective of race, color or creed; and

Whereas, it seems necessary now to reaffirm publicly this above mentioned policy,

THEREFORE, the Board of Education of the School District of the City of Pontiac publicly declares it is the policy of this Board to locate additions to school buildings and new schools on the basis of nearness and accessibility of these facilities to the children to be served irrespective of their race, color or creed." (Defendants' Exhibit 3).

In 1955, the Board resolved to:

"Restate and reaffirm its policy to employ, upgrade and assign all applicants for administrative, teaching, secretarial, clerical, maintenance and all other position classifications within the table of organization on merit without regard to race, color, marital status, nationality or religion." (Defendants' Exhibit 9).

In 1960, the school attendant policy was again reaffirmed by the Board, wherein it was stated:

"Whereas The School District of the City of Pontiac has maintained as official policy that all pupils shall attend the school which serves the attendance area in which they live and

Whereas this policy is maintained for all pupils without regard to race, color, nationality, or religious affiliation, and

Whereas it now seems desirable to reaffirm this policy publicly,

Therefore The Board of Education of the School District of the City of Pontiac publicly declares that it is the continuing policy that pupils shall attend the school which serves the attendance area in which they live, irrespective of race, color, nationality, or religious affiliation." (Defendants' Exhibit 4).

On December 9, 1964, the Board of Education once again found it necessary

and suitable to adopt a resolution wherein they stated that:

"Under our system of laws, it is the primary responsibility of each community to provide equal educational opportunities for all children in terms of quality instruction, adequacy of facilities and instructional materials, and opportunity for personal fulfillments. The latter can be accomplished to an adequate degree in our democracy only when the policies and practices of the school system place a positive emphasis upon achieving and maintaining a racially integrated school system. Providing this equity in educational opportunities is a part of the process of educational planning, done by cooperative means consistent with the basic educational philosophy of our school district.

### Pupil Placement

Pupil placement practices of the school district must be based on sound educational principles, and should provide integrated school populations insofar as this is possible.

The neighborhood school concept is believed to represent sound educational practice. Pupils will be guaranteed the right to attend the school which serves their attendance area as established by action of the Board of Education. The Board of Education recognizes that circumstances arise occasionally wherein shifts in population necessitate the temporary provision of special housing arrangements for pupils.

These may occur in the future, but do not negate the broad principle enunciated here.

The present school attendance areas have been established on the basis of the following criteria: the nearness of the pupils to school, the safety of pupil access routes to school, and the reasonable capacity of the school. At such times as changes in school attendance areas may be required, an additional criterion will be observed.

When possible, the boundaries shall be drawn so as to provide integrated student bodies in schools. This added criterion will also receive consideration along with other criteria in the selection of sites for the location of new schools.

### Employment and Assignment of Teachers

It is the continuing policy of the Board of Education to employ, upgrade, and assign all applicants for administrative, teaching, secretarial, clerical, maintenance, and all other positions within the table of organization on merit without regard to race, color, marital status, nationality, or religion.

The Board of Education believes it to be desirable that all school pupils should have the opportunity to receive instruction from white and Negro teachers during their years in school. Thus it is desirable to achieve and maintain an equitable distribution of Negro and white teachers in the various schools of the school district.

Teachers are professional persons, and as such have the right to have their views on their placement and assignment considered and respected. Furthermore, it is sound educational practice to assess the specific qualifications of each teacher, the specific needs of each position and, to the degree possible, match the qualifications of the employee to the needs of the position.

It is believed that an equitable distribution of white and Negro teachers, respect for the views of teachers with regard to assignments, and matching professional qualifications with the needs of each position can and should be achieved through appropriate in-service education, encouragement, and administrative effort.

### Educational Programs

It is the continuing policy of the Board of Education that educational

programs of excellence must be provided for all pupils in all schools. Where special educational needs are found to exist, special educational programs and services will be provided to meet these.

Text books, instructional materials, and instructional programs should be examined in light of their adequacy with respect to the role and contribution of the Negro in American development, the effect of slavery and discrimination of Negroes as individuals and a group, and the implications of the civil rights movement. These emphases are essential elements in the instructional program if good inter-group attitudes and understandings are to be developed among all children, and if the Negro child is to develop a good self-image, pride in his race and heritage, and a sense of equality as a human being.

*School Facilities*

It is the continuing policy of the Board of Education to provide the best possible school facilities for all schools and all pupils."

(Defendants' Exhibit 6).

In 1967, after approximately twenty long years of nothing more than resolutions and policy statements regarding intent to strive for and achieve racial balance, the Board set its sights on the distant future and adopted a *"Long Range* plan for school improvement and the achievement of an improved racial balance in the Secondary Schools of the School District of the City of Pontiac." With this act, the Board had one more statement of policy; and the Black community had one more written promise.

It is, therefore, apparent that there has been, since 1948, a thorough recognition by the Board of Education for the School District of Pontiac of the need toward achieving racial integration among student bodies, faculties and administrators within the system. Yet, the testimony clearly reveals that in 1954 when boundary lines were first drawn desig-

nating school attendance zones, the only criteria employed in determining the zones was nearness of school, safety of access routes and capacity. Despite any pronouncements or resolutions adopted, the testimony clearly reflects that the Board of Education *never* considered achievement of racial balance as a factor in setting the original boundaries. The testimony further indicates without question that ever since the incorporation of this fourth factor in 1964, there has been neither an attempt nor even a consideration toward modification, alteration or realignment of boundaries in light of the 1964 resolution. It follows quite logically then that achievement of racial balance has never been a legitimate factor in the setting of boundary lines. The 1964 pronouncement was made, but resulted in absolutely no realignment of existing boundary lines for the purpose of obtaining greater racial balance.

In addition, between the period of 1955 and 1964, nine new schools were also built without any consideration given toward achieving a racial mixture. The Board admits that schools were located in accord with housing development and, thereby, readily adopted the same segregated pattern; with the addition of each new school, segregation advanced—it became fixed and cemented. By 1964, no restatement or reaffirmation of previous policies, no adoption of new policies, no pronouncement of long range plans, and no realization or admission of segregation's harm to children could eliminate the segregated school pattern.

This Court is convinced, in view of the number of resolutions and policy statements outlined above, that the Board of Education for the Pontiac School District has committed itself to integration within their school system. A careful and thorough reading of the testimony in this matter, coupled with a study of prior, similar litigation regarding this matter (See Henry v. Godsell [D.C., 1958] 165 F.Supp. 87) reveals that these defendants were unquestiona-

bly aware, as early as 1954, of the import of their resolutions regarding integration, the goals to be obtained and the affirmative role they had in accomplishing those goals. It therefore becomes the duty of this Court to determine whether or not the Board of Education either implemented or ignored their own stated policies. Pronouncements of good intentions with nothing more amounts to "monumental hypocricy". (Senator Ribicoff, February 9, 1970).

In an attempt to analyze and understand the geography of the school district serving the City of Pontiac as well as the racial composition of that city, this Court has found it necessary and helpful to carefully review the testimony of the witnesses in accompaniment with the charts and exhibits admitted into evidence. This analysis will be limited to the elementary schools within the system as the testimony has demonstrated the pattern of segregation therein most clearly.

The statistics are as follows.

The Pontiac School District incorporates approximately 39 square miles; the City of Pontiac is situated directly within that area and encompasses approximately 20 square miles; there are at present 29 elementary schools located within the district; of this number 17 of those schools are practically speaking, all white; six of those schools are all Black; and six of the schools have an integrated student body; the ratio of *Negroes to whites* within the City of Pontiac is approximately *30% to 70%;* since 1954, 10 additional elementary schools have been added to the school system; 9 of those schools were added within the period 1954 through 1963; between 1955 and 1969 the School Board has found it necessary to change the zones for boundary of its attendance areas 12 times; the testimony reveals that the changes resulted from the addition of new facilities, and were never drawn originally nor modified with isolated purpose of attempting to achieve maximum racial balance within the schools. As mentioned earlier, none of the nine schools

built within the period 1955 through 1963 was located with any consideration as to achievement of racial mixture.

The additions of Alcott, Weaver and Lincoln Elementary Schools have created changes in the boundaries of Hawthorne, Owen and Wisner Schools, since 1955. The area and the schools are white.

Toward the more central area of town the additions of Mark Twain and Herrington Schools have created changes in the boundary lines of Baldwin, McCarroll, Emerson, Willis and Longfellow Schools since 1955. Prior to the addition of Twain and Herrington, children from the areas that those new schools presently serve had to travel the distance to the schools previously existing for them. At the time of their construction the new schools mentioned serviced solely white areas and were attended by whites. More recently, both Twain and Herrington have become integrated schools; their existence, however, and strategic locations allow for continued segregation of the surrounding schools of Central, Baldwin, McCarroll, Emerson and Willis Schools. But for the existence of Twain and Herrington Schools, the surrounding schools with their previous boundary lines would find themselves now integrated. Because of the existence of these two newer schools in the vicinity, the remaining schools of the area have been permitted to remain white. There has been no attempt to rearrange boundary lines within the area so as to obtain a greater degree of racial mixture even though the previous boundary lines of the older and still all-white schools nearby originally encompassed attendance areas which, if still enforced now, would allow for integration within those schools.

To the south of the business area of the City of Pontiac is found the section of town serviced by Whittier, McConnell, and Wilson Schools. It was the decision of the Board of Education in 1954 to construct the Bethune Elementary School in order to alleviate overcrowding at nearby Bagley. Even though the

Webster School to the North of the Bagley School had an overwhelmingly large capacity, the Board of Education decided to erect Bethune School so as to accommodate only the overflow of Bagley. Bethune became all Black. Webster remained all white. There was no school constructed so as to alleviate the needs of both the white Webster School and the Black Bagley School by creating an integrated school somewhere between the two. Even though other locations appeared at the time to be equally suitable to the location of the new Bethune School, and indeed other locations had been considered by the Board of Education, the school was placed in such a fashion that it was attended solely by Blacks. Bethune School was built in 1955 and became the subject matter of the litigation previously mentioned. (Henry v. Godsell, *supra*).

If this Court's attention were directed and limited solely to the location of the Bethune School without being confronted by or concerned with the total pattern which was, at the time, developing in the construction of new schools in the system, the School Board may have succeeded in providing a persuasive argument here, as it did earlier, that the location of the Bethune School could be justified on the grounds of the existing criteria, namely, nearness, capacity and safety of access routes. However, this Court's consideration is not limited or directed solely to the location of the Bethune School, but has been broadened to take into consideration the composition of the entire Pontiac School System. The prior litigation regarding Bethune School is significant as it indicates the early awareness of the Board of Education that a definite pattern of segregation was developing by their choice of locating schools. Rather than taking affirmative steps to counteract the pattern obviously developing as of 1955, the School Board, to the contrary, by its location of additional schools subsequent to 1955, assured the progression of that segregated pattern.

In 1958 the Franklin School was built so as to alleviate the overcrowding at Whittier and Wilson; Franklin took the complexion of its predecessors, namely Black.

If sufficient evidence had not already been presented to indicate the active role of the School Board in advancing the segregated nature of the School District, attention then need only be directed to location of the Irving School, built in 1959. Originally, the area adjacent to the Bagley School area was serviced by Whitfield, an all-white school. The boundary line between Bagley and Whitfield served to effectively eliminate any possible integration of student bodies within those two schools. As mentioned earlier, the construction of Bethune alleviated any overcrowding at Bagley. Within a very short time after the construction of the new, all-Black Bethune School, it became apparent that the nearby all-white Whitfield School also was becoming overcrowded. To alleviate that situation without jeopardizing the pale complexion of the school, the Board of Education erected the Irving School. Irving School has a total attendance of 167 students; it is the smallest full elementary school within the Pontiac School system. It has been located in such a fashion as to serve solely whites. It could have been and should have been located otherwise so as to achieve the racial balance for which the Board expressly strived.

This Court finds that the Pontiac Board of Education intentionally utilized the power at their disposal to locate new schools and arrange boundaries in such a way as to perpetuate the pattern of segregation within the City and thereby, deliberately, in contradiction of their announced policies of achieving a racial mixture in the schools, prevented integration. When the power to act is available, failure to take the necessary steps so as to negate or alleviate a situation which is harmful is as wrong as is the taking of affirmative steps to advance that situation. Sins of omission

can be as serious as sins of commission. Where a Board of Education has contributed and played a major role in the development and growth of a segregated situation, the Board is guilty of *de jure* segregation. The fact that such came slowly and surreptitiously rather than by legislative pronouncement makes the situation no less evil.

The Board of Education cannot absolve itself from responsibility for this situation when it had the power, duty and control to prevent the situation. It would be feigned modesty on the part of any Board of Education to suggest that it is controlled by a situation rather than that it can control. A decision regarding location of new schools is one for the Board as the evidence in this case amply demonstrates. For a school Board to acquiesce in a housing development pattern and then to disclaim liability for the eventual segregated characteristic that such pattern creates in the schools is for the Board to abrogate and ignore all power, control and responsibility. A Board of Education simply cannot permit a segregated situation to come about and then blithely announce that for a Negro student to gain attendance at a given school all he must do is live within the school's attendance area. To rationalize thusly is to be blinded to the realities of adult life with its prejudices and opposition to integrated housing.

The question is no longer where the first move must be made in order to accomplish equality within our society; the question has become and, possibly has always been, who has the power and duty to make those moves so as to advance the accomplishment of that equality. This Court believes that the Pontiac Board of Education had and has the power and responsibility to make decisions as to locations of new schools and boundary lines so as to achieve an integrated student body. This Court acknowledges the recently enunciated position that a Board of Education has no affirmative duty to eliminate segregation when it has done nothing to create

it, but this Court finds that the Pontiac Board of Education did a great deal to create the patterns presently existing within that school district and is now responsible to take action so as to eliminate the very situation which it caused. The harm to another generation of Black children while awaiting implementation of "long-range plans" to integrate simply cannot be tolerated, and no degree of expense is unbearable when placed along side of the unbearable situation which exists for those Black children. The safety and well-being of children in life involves more than the access routes in reaching school.

This Court believes in quality integrated education for all children. As early as 1958 the Superintendent of the Pontiac School System, Dr. Dana P. Whitmer, expressed similar beliefs and manifested a thorough awareness of the problems and goals when he stated:

"As a result of my own experience in Pontiac, and in Gary and previously, as well as my own study of this major problem which we face in our country, I feel that segregation, sanctioned in a school district, for example, is both abhorrent and illegal. Certainly if in this country we are to achieve in reality the ideals and principles on which it was founded, segregation, which prevents the natural and normal association together of people of varying ethnic, religious and racial backgrounds, must not be sanctioned in this country. And, consequently, in the discussions with the Board of Education of the School District of the City of Pontiac we have attempted continually to take such action as would not segregate the schools." (See Henry v. Godsell, *supra*, 165 F. Supp. p. 91).

Just as there has been failure to implement pronounced policies regarding the elimination of segregation within the school body, so too has there been a failure to provide an integrated faculty or administration within the system. The fact that the Board employs Negro faculty members when the majority of

those teachers are confined to Black schools, is indicative of a practice of following and indeed advancing the segregated characteristic of the schools. A review of the testimony and exhibits made available to the Court reveals that, historically, Black teachers have been and continue to be assigned to Black schools and white teachers assigned to white schools. The fact that the Board of Education has, in an attempt to deprive the plaintiffs of any complaint in this regard, assigned one or two Black teachers to all-white schools and, vice versa, is insufficient evidence that the problem is being corrected.

For example, Alcott School has a total enrollment of 608 students, 605 of which are white; Alcott has no Black teachers. Emerson School has an enrollment of 656 students all of whom are white; Emerson has one Black teacher. Wever School, Whitfield School, Wisner School, Malcolm School and Willis School all have a white student body; each has one Black teacher. Other all-white schools have, at most, two Black teachers. Whittier School, an all Black School, has two white teachers.

This Court could repeat here reams of testimony presented by the defendants to explain the situation in the teaching faculty which is presently found to exist. The record speaks for itself in this regard and warrants no magnified attention to reflect the discriminatory practices which continue to be followed in the Pontiac School System as to assignment of faculty and promotion of administrators. Segregation of faculties alone is sufficient for a finding that discrimination as to race has occurred in the Pontiac School System and that the Board is guilty of *de jure* segregation; the fact that a teacher must be consulted pursuant to contract prior to any transfer does not negate the fact that the Board has the power to effectuate transfers so as to assure quality education.

In this regard, Mr. William Lacy, Assistant Superintendent for Instruction and School Organization, testified that "it's my position that it is important that children receive instructions from both Black and White teachers during their public school careers. I feel that children who are being prepared to work and live need to know something about minority groups and in Pontiac the Black and white groups are of particular importance; and if a child, a white child receives instructions from a Black teacher, I think this enables him to form opinions of Black—about Black people that might be different from what he had previously had." " * * * The interests of the child is always primary" to that of the teacher. (Pp. 105–106).

Yet, despite this "primary interest" in the children, Mr. John Perdue, Director of School, Community and Human Relations acknowledged, as to integration of faculties, "(t)here have been some things that have been accomplished within the last two years that would indicate that the policy has been followed. * * * Prior to the last two years, no, I would say absolutely no, because I see no evidence of what we are trying to—of Black people in certain places." (Mr. Perdue, P. 150). It was the testimony of Dr. Whitmer that there would be no monumental cost in transferring teachers so as to achieve the racial balance which the many resolutions recognize as necessary.

In view of the racial imbalance which obviously exists in the faculties of the Pontiac School system, it is incumbent on the defendants herein to prove that such did not result from discriminatory practices on their part. This the Pontiac Board of Education has failed to do. See Chambers v. Hendersonville City Board of Education (4 Cir., 1966), 364 F.2d 189. Rolfe v. County Board of Education of Lincoln County, Tennessee (6 Cir., 1968), 391 F.2d 77. As stated in Wheeler v. Durham City Board of Education (4 Cir., 1966), 363 F.2d 738:

"The locus standi of pupils and parents to question faculty assignments was conclusively declared in Bradley v. School Board, supra, 382 U.S. 103, 86 S.Ct. 224, [15 L.Ed.2d 187]. We

read the decision as authority for the proposition that removal of race considerations from faculty selection and allocation is, as a matter of law, an inseparable and indispensable command within the abolition of pupil segregation in public schools as pronounced in Brown v. Board of Education, supra, 347 U.S. 483, [484], 74 S. Ct. 686, [98 L.Ed. 873]. Hence no proof of the relationship between faculty allocation and pupil assignment was required here. The only factual issue is whether or not race was a factor entering into the employment and placement of teachers.".

## CONCLUSIONS OF LAW

Based on the above findings, it is the opinion of this Court that the Pontiac School Board cannot use the neighborhood school concept as a disguise for the furtherance or perpetuation of racial discrimination when they participated in the segregated policy. (See Deal v. Cincinnati Board of Education [6 Cir., 1969] 419 F.2d 1387.) The policies and practices of school officials or their predecessors in the past, when amounting to de jure segregation, cannot be overlooked and ignored even though there may be a present day resolution in complete contradiction to prior practices. If school officials discriminated at any time on account of race and thereby created an unfair situation the effects of which presently persist, then the present day officials have an immediate obligation to overcome the effects of past discriminatory acts when such acts resulted in de jure segregation. See United States v. School District No. 151 (D.C., 1969), 301 F.Supp. 201.

Once it has been demonstrated as it has in this case that attendance lines were consistently drawn in such a fashion so as to discourage achievement of integration when such need not have occurred, the presumption can be made that the results reached were intended. When school officials have located new schools in such a fashion as to intensify racial imbalance, then the resulting situation is de jure segregation and they have the duty to eradicate the results of their discriminatory acts. See Dowell v. Board of Education (1969) 396 U.S. 269, 90 S.Ct. 415, 24 L.Ed.2d 414. Where attendance lines have been drawn in such a way as to effectuate segregation and could be redrawn in such a way as to implement integration the latter policy must be followed immediately.

The right of all school children to obtain equal educational opportunity is of "paramount importance" (See Alexander v. Holmes County School Board [1969] 396 U.S. 19, 90 S.Ct. 29, 24 L. Ed.2d 19) and cannot be subordinated even to criteria of nearness, safety of access routes, or capacities of the schools.

Where placement of teachers has been made and continues to be made based on race and such placement contributes to the segregated characteristics of the schools, officials are obligated, under the Fourteenth Amendment, to make equitable distribution of teachers and administrators. Failure to do so deprives students of the right to be free of a situation by which their school is racially identifiable. (See Kelley v. Altheimer, Ark. Public School Dist. [8 Cir., 1967], 378 F.2d 483.)

Having purposely allowed such a situation to exist among its faculty members, the Pontiac Board of Education has the duty to modify and relocate teaching faculties so as to achieve a satisfactory racial balance, and such objective cannot be made contingent upon the willingness or unwillingness of a teacher to transfer voluntarily. (See United States v. Board of Education of City of Bessemer [5 Cir., 1968], 396 F.2d 44; Monroe v. Commissioners of City of Jackson [6 Cir., 1967] 380 F.2d 955). Once it has been shown that most Black teachers are assigned to Black schools and most white teachers to white schools, it then becomes the burden of the Board of Education to show that such assignments were not racially motivated. (See Chambers v. Hendersonville, supra). In the absence of such a

showing it is incumbent upon the Board to relieve the segregated situation found among the faculty members and administrators. A segregated faculty is indicative of a segregated school district.

## ORDER

### I

Based on the findings of facts and conclusions of law heretofore enunciated —it is the ORDER of this Court that the Defendant Pontiac School District integrate its school system at all levels, student body, faculties and administrators, before the beginning of the school year of September, 1970.

### II

■ The Pontiac School District is further ordered to submit, for the Court's approval, on or before March 16, 1970, a comprehensive plan for the complete integration of the entire school system. Such integration shall be accomplished by the revising of boundary lines for attendance purposes, as well as by busing so as to achieve maximum racial integration.

In this regard the school district may find it helpful to seek out the advice of the Department of Health, Education and Welfare. No final judgment will be entered in this matter until such time as this order has been implemented.