Donald DAVIS, et al., Plaintiffs,

v.

**SCHOOL DISTRICT OF THE CITY OF PONTIAC, et al., Defendants.**

No. 32392.

United States District Court, E.D. Michigan, Southern Division.

May 11, 2000.

H. Wallace Parker, Bloomfield Hills, MI, for plaintiff.

Jeffrey T. Stewart, Dennis R. Pollard, Bloomfield Hills, MI, for defendant.

*OPINION AND ORDER DISSOLVING PERMANENT INJUNCTION AND TERMINATING JURISDICTION*

ROSEN, District Judge.

## I. INTRODUCTION

Three decades ago, this Court determined that the Pontiac School District was responsible for *de jure* segregation in student assignments and staffing and ordered the District to completely integrate the entire school system.[1] To achieve maximum integration, the Court specifically ordered the revision of school attendance boundary lines and further specifically directed the implementation of a busing program. To accomplish these directives, the Court ordered the School District to submit a comprehensive integration plan.

Pursuant to the Court's directive, the District submitted its "Comprehensive Plan for Integrating the Pupils and Staff of the School District" which was approved by the Court, with modification, on August 11, 1971, and subsequently implemented under Court supervision.

The Comprehensive Plan reorganized the population of each school building by reducing the number of grade levels in each building and then drawing students, through busing, from neighborhoods across the school district in order to populate each grade level and building with a racial mix of students more closely approximating the racial mix of the District as a whole. Broad-based busing of students across the school district was required to accomplish the objectives of the plan. The

1. Judge Damon J. Keith (now a Senior Circuit Judge) presided over this action at the time the 1970–74 desegregation orders referenced herein were entered.

District faithfully following its Plan and reported compliance and progress to the Court every six months.

After finding that Pontiac had operated a racially-balanced District in accordance with its comprehensive integration plan for four years, on October 9, 1974, the Court determined that the District had "removed all vestiges of state-imposed segregation," and accordingly terminated judicial supervision of the Pontiac Schools. The Court, however, did not completely relinquish its control over the matter. It specifically retained continuing jurisdiction over the case to ensure proper continued administration of its orders, and entered a permanent injunction providing that the School District must maintain in perpetuity a ratio of black to white students in each school building which "shall not deviate by more than 10% above or below the respective percentage of black and white students in the school system as a whole." [See October 9, 1974 "Judgment Entry to Decree Permanent Injunction and to Terminate Court Supervision".] This Order remains in effect to this day, more than twenty-five years later.

The racial composition of the neighborhoods in the District and the District's schools has significantly changed since October 1974 such that maintaining compliance with the Court's plus/minus 10% black/white ratio has become difficult. For this reason, the School District has moved for a modification of the injunctive order. Specifically, the District has requested that the plus/minus 10% ratio be increased to 20% and to ensure that racial diversity is maintained within the schools, the District has further requested that the Court retain jurisdiction over the case for three more years.

After conducting a "show cause" hearing on the District's requested relief, the Court noted that, in light of Supreme Court decisions post-dating the October 9, 1974 order, there did not appear to be a sufficient basis for the Court to retain jurisdiction over the matter. Therefore,

the Court ordered the District to submit evidentiary support for its request that the Court retain jurisdiction over this action. (The Court also gave Plaintiffs the opportunity to respond to whatever evidence the District submitted.)

The District has complied with the Court's directive and has submitted the Affidavit of Dr. Robert Taylor, Director of Student Services for the Pontiac School District, with supporting documentation. Plaintiffs have not filed any objection or response to Dr. Taylor's Affidavit, nor have they submitted any contradictory evidence of their own.

Having reviewed and considered the evidence submitted by the District and the entire record of this matter, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

## II. *PERTINENT FACTS*

This action was instituted in 1969 by black students in the Pontiac School District, through their parents and next friends, against the School District, its superintendent, assistant superintendent, and the seven members of its Board of Education. In their Complaint, the Plaintiffs alleged that the Defendants drew zone attendance lines for elementary schools which had as their purpose or effect the maintenance of separate schools for white and black children in violation of the Equal Protection Clause of the Fourteenth Amendment. *See Davis v. School District of the City of Pontiac,* 309 F.Supp. 734, 735 (E.D.Mich.1970). The Plaintiffs further alleged that it was the discriminatory policy of the District to place black instructional personnel and administrators primarily in predominantly black schools. *Id.*

Following a six-day trial, on February 17, 1970, the Court found in favor of the Plaintiffs and ordered the School District to integrate its school system at all levels and to submit a comprehensive plan to achieve this integration. In finding for the

Plaintiffs, the Court specifically determined that the Pontiac School Board had intentionally utilized its power to arrange school boundaries to perpetuate the pattern of segregation within the City and thereby prevented integration of the school student population. 340 F.Supp. at 741–42. The court also found that the District failed to provide an integrated faculty and administration within the system. "The fact that the Board employs Negro faculty members when the majority of those teachers are confined to Black schools, is indicative of a practice of following and indeed advancing the segregated characteristic of the schools." *Id.* at 742. Therefore, the Court ordered that before the start of the September 1970 school year, the District "integrate its school system at all levels, student body, faculty and administrators" and ordered the District to submit for the Court's approval a comprehensive plan to achieve this complete integration. *Id.*

The District complied with the Court's directive and drew up and submitted its "Comprehensive Plan for Integrating Pupils and Staff in the Pontiac School System." The Court subsequently approved the District's Plan, with minor modification, and the Plan was implemented under Court supervision.

As indicated above, the Comprehensive Plan reorganized the population of each school building by reducing the number of grade levels in each building and then drawing students, through busing, from neighborhoods across the school district in order to populate each grade level and building with a racial mix of students more closely approximating the racial mix of the District as a whole. As noted, an ambitious plan of busing of students across the school district was necessary in order to accomplish the objectives of the plan.

At the time that the Plan was implemented, the student population of the Pontiac School District was approximately 69% white[2] and 31% black.[3] 340 F.Supp. at 740. *See also* Taylor Affidavit, Ex. 1, School District of the City of Pontiac Fourth Friday Enrollments, 1969–70 and 1968–69. The District had 29 elementary schools, 17 of which had student bodies which were essentially all white; six of the elementary schools were all black and the remaining six were integrated, 309 F.Supp. at 740. *See also* Taylor Affidavit, Ex. 1. There were also six junior high schools, two of which were virtually all white, one was all black and the remaining three were integrated. *Id.* Of the two high schools in the District, one was more than 85% white while the other had a black/white ratio of 47% to 53%. *Id.* The predominantly all white schools had at most two black teachers each while the all black schools had at most two white teachers. 309 F.Supp. at 743.

The implementation of the District's Comprehensive Plan resulted in schools with "racially balanced" student populations that approximated the 70% to 30% racial mix of City and the School District as a whole.[4] The District faithfully adhered to its Comprehensive Plan and reported compliance and progress to the Court every six months for the next four years.

By October 1974, the Court was satisfied that the District had complied with its

---

**2.** Hispanics, Asians and Native Americans were, and are, deemed "white" in the District's student enrollment statistics.

**3.** This was also essentially the same racial composition of the City of Pontiac. 309 F.Supp. at 740.

**4.** The Court's orders also contemplated integration of the staff and the District's goal was to achieve a racial composition in each building that was within 10% of the racial composition of the staff as a whole which was 29% black and 71% white. *See* Taylor Affidavit ¶ 14 and Ex. 8. By the fall of 1971, the District reached that goal with respect to 30 of the 36 schools then in existence. *See* Taylor Affidavit Ex. 8. As for the six schools where that ratio was not met, five had faculties that were 50% black and 50% white. *Id.* The sixth school was within 12% of the 29% to 71% ratio. *Id.*

desegregation decree for the previous four years, and on October 9, 1974 entered an order declaring that all vestiges of segregation had been removed from the Pontiac School District. The October 9, 1974 Order stated in pertinent part:

> In compliance with orders of this court the defendants commenced a program of racial balance in the schools of the Pontiac School District when schools opened in the fall of 1971 This is the fourth year in which the defendants have been operating a racially balanced school system in accordance with the court's orders. The defendants have rendered reports to the court every six months which show that the defendants have removed from the public schools in Pontiac all vestiges [sic] of state imposed segr[eg]ation....

> WHEREFORE, it is considered, ordered and adjudged as follows:

> 1. The defendants shall prevent state imposed segregation in the Pontiac Public Schools.

> 2. The comprehensive plan for integrating pupils and staff as modified and approved by the Court by Order dated August 11, 1971, shall be continued in full force and effect.

> 3. Unless otherwise ordered by the Court, the pupil population of each school shall be arranged so that the number of black students and white students in each school shall not deviate by more than 10% above or below the respective percentage of black and white students in the school system as a whole.

> \*  \*  \*  \*  \*  \*

> 6. This order shall have the effect of a permanent injunction prohibiting segregation and requiring the continued maintenance of [an] integrated school system.

*See* Taylor Affidavit Ex. 5.[5]

No other judicial action was taken in this case in the ensuing 25 years until the School District presented the Court with its request for modification of the October 9, 1974 Order. As indicated above, the Court ordered the District to submit evidentiary support for the Court's retention of jurisdiction over this matter and further ordered that copies of any material sub-

---

**5.** The Court's October 9, 1974 order did not specifically mention integration of the teaching staff. However, given that Judge Keith held in his original post-trial desegregation ruling that the District had made its placement of teachers based on race and that "such placement contribute[d] to the segregated characteristics of the schools," and given that in his October 9, 1974 order, Judge Keith specifically found that defendants had "been operating a racially balanced school system in accordance with the court's orders" for the previous four years and expressly determined that the District had "removed from the public schools in Pontiac all vestiges of state imposed segregation," the Court believes that Judge Keith must have been satisfied not only with the District's desegregation of the student populations of its schools but also with its staffing assignments. The statistics provided by the District [Taylor Affidavit Ex. 8] demonstrate that the District had, for the four years prior to the Court's entry of the October 1974 order, maintained racial balance in the staffing of its schools in substantial compliance with its goal of staffing within plus/minus 10% of the ratio of blacks to whites on the faculty as a whole. As noted in note 4 *supra*, in the 1971–72 school year that goal was reached with respect to 30 of the 36 schools then in existence. *See* Taylor Affidavit Ex. 8. As for the six schools where that ratio was not met, five had faculties that were 50% black and 50% white. *Id.* The sixth school was only 2% out of compliance. *Id.* In the 1973–74 school year, after having closed five schools, 24 of the 31 then existing schools were in compliance. *Id.* Six of the remaining seven schools deviated 3% or less from the plus/minus 10% goal. *Id.* The seventh school had a faculty that was essentially 50% black and 50% white. *Id.* In the fall of 1974, there were 32 schools utilized in the system. Of those 32 schools, 25 were in full compliance. *Id.* Of the seven non-compliant schools, three had faculties that were approximately 50% black and 50% white, and two were within 2% of compliance. *Id.* Judge Keith obviously was not troubled by the District's failure to achieve absolute total compliance with its plus/minus 10% goal in staffing or he would not have unequivocally declared that he had found all vestiges of segregation to have been eradicated.

mitted to the Court be served upon "every plaintiff whose whereabouts is known to the school district, former counsel for the plaintiff and the North Oakland County Branch of the NAACP." [*See* June 22, 1998 Order Adjourning Show Cause Hearing Pending Submission of Proposed Modified Order.] The District submitted some materials in December 1998 but the Court deemed them insufficient. Therefore, it ordered further submission of evidence and gave the District three months to assemble such evidence. (The District subsequently requested and was granted a two-month extension of time to submit its evidence.) The Court also provided equal time for objections and/or responses to be filed by interested parties. As indicated above, there have been no objections or responses filed to the District's proffered evidence.

## A. CHANGES IN THE DEMOGRAPHICS OF PONTIAC AND THE PONTIAC SCHOOL DISTRICT

### 1. Student Population

As indicated above, at the time that the Pontiac School District's Comprehensive Plan for the integration of its schools was implemented, the student population of the Pontiac School District was approximately 69% white and 31% black. (The City of Pontiac had a similar racial composition—70% white and 30% black.) There were 36 schools in the District and the total public school enrollment at that time was 24,474. [*See* Taylor Affidavit Ex. 1 and 6.] By the beginning of the 1974 school year, however, those demographics had already begun to change.

Within those four years, public school enrollment dropped 16% to 20,671. [*See* Taylor Affidavit Ex 6] The racial composition of the student population also had begun to change during that time and has continued to change in the intervening years. By September 1974, the District had gone from a 31% black—69% white enrollment to an enrollment which was 41% black and 59% white. *Id.* By 1990,

the District was 54% black and 46% white. *Id.*

Over the years, total enrollment has continued to steadily decline such that by the 1998–99 school year, there were only 12,584 students in the Pontiac School System, reflecting a more than 48% decline in enrollment from the time when the court-ordered desegregation plan was implemented. [*See* Taylor Affidavit Ex. 1, 6.] The racial composition of the student enrollment has similarly experienced significant further change: by 1998, blacks made up 60% of the total student population while whites, Hispanics, Asians and others made up the remaining 40%.

### 2. Faculty and Administration

The racial composition of the faculty, central office administration and the School Board has also changed over the course of time. With respect to the faculty, while in 1971–72 whites made up approximately 71% of the teaching staff with blacks comprising only 29%, by 1996, this population had changed to one which consisted of close to 40% black and 60% white. *See* Taylor Affidavit Ex. 8. Furthermore, the District has gone from an all white School Board and central office administration to one where, at the present time, all of the School Board members and a majority of the central office administrators are now black. Taylor Affidavit, ¶ 10.

## B. MAINTAINING COMPLIANCE WITH THE COURT'S ORDERS

As Pontiac has gone from a minority to a majority black population and public school enrollment, the District has attempted to maintain compliance in all of its schools with the Court's plus/minus 10% ratio of the racial composition of student enrollment to the District's population as a whole. At the same time, the District has struggled with severe financial difficulties. Taylor Affidavit, ¶ 11. Throughout the 1970's and '80's, at the same time that millage proposals were rejected, expenses

advanced at a level above the general inflation rate. *Id.* Further, declining population mandated the closing of 14 schools. Taylor Affidavit Ex. 6.

To maintain compliance with the Court's 1974 decree while facing declining enrollment and increased costs, the District cut back on some busing and redistricted some school boundaries three times, in 1981, 1989 and 1990. *Id.* at ¶¶ 11–12. *See also* Taylor Affidavit Ex. 6. Further, some integration of the schools was being achieved naturally with the change in the racial composition of the community. Taylor Affidavit ¶ 12. Despite the District's efforts, however, in recent years, the racial composition of more than half of the District's current 23 schools has fallen out of compliance with the Court's "plus or minus 10 percent" directive. *Id.* at ¶ 13.

Nonetheless, the statistics provided by Defendant show that the District has remained in substantial compliance with Judge Keith's Order. The percentage of students out of compliance through 1990 was *de minimus*—only 0.6% to 1.5% of students were affected. *See* Taylor Affidavit Ex 6. By 1990, however, total enrollment had declined by more than 30%, necessitating two redistrictings and the closing of six schools within the next three years. *Id.* This resulted in an increase in percentage of non-compliance to approximately 3%—4%. *Id.* This overall 3% non-compliance remained substantially constant through 1998–99. *Id.*[6]

Similarly, the evidence shows substantial compliance with the District's plus/minus 10% goal with respect to teaching assignments. As noted in footnote 5 *supra*, Judge Keith was satisfied with less than total compliance with that goal for the period 1971–1974. Although statistics are not available for every school for every year thereafter, those years where complete statistics have been provided show continued substantial compliance.

For example, in 1976–77, 23 of the District's then 33 schools were in complete compliance with the District's goal of a racial composition of the staff of each school reflecting plus/minus 10% of the racial composition of the total faculty, which at the time was 27.5% black and 72.5% white. *See* Taylor Affidavit Ex. 8. Of the 10 schools that did not achieve total compliance, three schools had faculties that were approximately 50% black and 50% white—which mirrored, within 3 percentage points, the racial composition of the overall student population at the time.[7] *Id.* Only one of the other seven non-compliant schools deviated by more than 2.5% of the stated goal. *Id.* Similarly, in 1977–78, there were only nine non-compliant schools, three of which had faculties that were racially equally divided. *Id.*

In the 1980's, with redistricting and the closing of a number of schools, five more schools fell out of compliance. *Id.* However, of the non-compliant schools, nearly a half of them had faculties that were approximately 50% black and 50% white, which was the racial composition of the student population.[8] Five others had deviated from the plus/minus 10% goal by less than 5%. *Id.* This degree of deviation was substantially the same in the 1990's. *Id.*

The District is prepared to implement a new "Unitary Status Plan" which would call for achieving a racial composition in all of its schools within 20 percentage points of the District-wide composition within three years. *See* Defendant's Memoran-

---

6. Student enrollment statistics have only been provided on a school-by-school basis for the 1997–98 and 1998–99 school years. *See* Taylor Affidavit Ex. 7. These figures show that the non-compliant schools in these years were out of compliance, in general, by less than 10%. Only four schools in 1997–98, and three schools in 1998–99, were out of compliance by 20% or more.

7. In 1976–77, the student enrollment was 47% black and 53% white. *See* Taylor Affidavit Ex. 6.

8. *See* Taylor Affidavit Ex. 6.

dum of Law in Support of Proposed Order, Ex. A. This proposed plan further would call for each school to have a faculty that reflects the percentage of black teachers in the district, plus or minus 15 percentage points. The District asks that the Court retain jurisdiction over this matter for three years to monitor implementation of this proposed new plan.

## III. DISCUSSION

The debate over court-ordered desegregation through school busing which raged across this country in the 1960s and 1970s was one of the most rancorous and controversy-filled in our Nation's history, dividing communities and stirring latent passions about race and the role of the Federal government—and particularly Federal courts—in the governance of our local schools. Even now, with the perspective of almost three decades, historians, sociologists and legal scholars vigorously disagree over the socio-economic, demographic and educational impact busing has had on our communities.[9] As in so many areas of debate, current perspectives on the impact of busing appear divided along the lines of the old adage, "Where you come in is where you go out." But, whatever one's perspective, past or present, most reasonable observers agree on one thing: Federal court involvement in our local schools through injunctive supervision and monitoring was never intended to be without limit or end.

In fact, the Supreme Court has specifically declared that judicial supervision of local school systems as a result of past discrimination was not intended to operate in perpetuity. See Board of Education of Oklahoma City v. Dowell, 498 U.S. 237, 111 S.Ct. 630, 637, 112 L.Ed.2d 715 (1991). As the Dowell Court explained:

From the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination.

\*    \*    \*    \*    \*    \*

Local control over the education of children allows citizens to participate in decisionmaking, and allows innovation so that school programs can fit local needs. The legal justification for displacement of local authority by an injunctive decree in a school desegregation case is a violation of the Constitution by local authorities. **Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that "necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination."**

*Id.* (Citations omitted.) *See also Freeman v. Pitts,* 503 U.S. 467, 112 S.Ct. 1430, 1445, 118 L.Ed.2d 108 (1992) ("[L]ocal autonomy of school districts is a vital national tradition. Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system." (Citations omitted)); *Missouri v. Jenkins,* 515 U.S. 70, 115 S.Ct. 2038, 2049, 132 L.Ed.2d 63 (1995).

The question then is when, and under what circumstances, a desegregation decree should be dissolved. On this issue, the Supreme Court has instructed lower courts to inquire "whether the [School] Board ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to

---

**9.** *See e.g.,* DAVID J. ARMOR, FORCED JUSTICE: SCHOOL DESEGREGATION AND THE LAW (1995); Stephen L. Wasby, Race Relations In An Age Of Complexity (1995); Rita E. Mahard & Robert L. Crain, Research On Minority Achievement In Desegregated Schools, In The Consequences Of School Desegregation (1983); Gary Orfield, *Metropolitan School Desegregation: Impacts on Metropolitan Society,* 80 MINN. L. REV. 825 (1996).

the extent practicable." *Freeman v. Pitts, supra,* 112 S.Ct. at 1446 (quoting *Dowell, supra,* 111 S.Ct. at 638.)

In considering these factors, the Court further has instructed that lower courts should give particular attention to the school system's record of compliance. *Freeman, supra.* However, in examining racial imbalances found within a school district after the entry of a desegregation decree, the *Freeman* Court cautioned,

> That there [is] racial imbalance in student attendance zones [is] not tantamount to showing that the school district [is] in noncompliance with the decree or with its duties under the law. Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance is caused by a constitutional violation. Once the racial imbalance due to the *de jure* violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors.

112 S.Ct. at 1447. *See also Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 2705, 49 L.Ed.2d 599 (1976) (once the initial implementation of the court-approved plan accomplished desegregation, the district court was not entitled to require the school district to rearrange its attendance zones each year so as to ensure that the racial mix desired by the court was maintained in perpetuity.)

■ As the Court explained in *Swann v. Charlotte–Mecklenburg Bd. of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971):

> Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial compositions of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system.... [Thus,] in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic pat-

terns to affect the racial composition of the schools, further intervention by a district court should not be necessary. 91 S.Ct. at 1283–84.

■ Hence, as the Court stated in *Dowell* and reiterated in *Freeman,* "A history of good faith compliance is evidence that any current racial imbalance is not the product of a new *de jure* violation, and enables the district court to accept the school board's representation that it has accepted the principle of racial equality and will not suffer intentional discrimination in the future." *Freeman v. Pitts, supra,* 112 S.Ct. at 1449.

■ Applying the foregoing principles to this case, the Court finds that the Pontiac School District has more than sufficiently demonstrated good faith compliance with the desegregation decree. The District has worked diligently throughout the course of past three decades to adhere to the Court's plus/minus 10% of the population directive with respect to the racial composition of its student population and faculty. While changing demographics and the financial constraints suffered by urban public school systems across the country, as well as collectively-bargained contractual limitations with respect to faculty placement, may have precluded absolute compliance, the majority of deviations have been *de minimus* and certainly not the result of racial animus or constitutional violation. As the record shows, the District tried various means, including three redistrictings, to bring all of the schools into compliance.

The Court is convinced by the District's persistent attempts to achieve compliance with the Court's injunctive decree and its goals with respect to racially-balanced staffing that the District has complied in good faith with the Court's orders and is committed to desegregation. That the District is committed to a desegregated school system is further evidenced by its intent to proceed with a "Unitary Status Plan" which will include magnet schools

and continued School Board monitoring of integration within the system.[10]

The Court further finds that the vestiges of past discrimination have been eliminated to the extent practicable. In fact, Judge Keith expressly found this to be the case 25 years ago. As Justice Thomas explained in *Missouri v. Jenkins, supra,*

In order for a "vestige" to supply the ground for [a court's continued] exercise of remedial authority, it must be clearly traceable to the dual school system. The "vestiges... must be so real that they have a causal link to the *de jure* violation being remedied." District Courts must not confuse the consequences of *de jure* segregation with the results of larger social forces or of private decisions. "It is simply not always the case that demographic forces causing population change bear any real and substantial relation to a *de jure* violation." As state-enforced segregation recedes farther into the past, it is more likely that "these kinds of continuous and massive demographic shifts will be the real source of racial imbalance.... And as we have emphasized," "[i]t is beyond the authority and beyond the practical ability of the federal courts to try to counteract" these social changes.

When a district court holds the State liable for discrimination almost 30 years after the [tainted] official state action, it must do more than show that there are schools with high black populations or low test scores.

115 S.Ct. at 2063 (Thomas, J. concurring) (citations omitted).

While it is true that, in this case, over the years, a number of Pontiac schools have slipped out of absolute compliance, as indicated above, most of the deviations from Judge Keith's plus/minus 10% requirement have been *de minimus.* And, while five or six schools currently show more than a *de minimus* deviation, there is no evidence of record which suggests that these deviations are the vestiges of past discrimination as opposed to being the result of demographic changes. As the Supreme Court stated in *Spangler, supra,* "[T]he Court has consistently held that the Constitution is not violated by racial imbalance in the schools without more." 96 S.Ct. at 2703–2704.[11]

Thus, because the Court finds that the Pontiac School System has demonstrated continued good faith compliance with the Court's earlier desegregation decree, and because the Court further finds that the vestiges of past discrimination in the Pontiac School System have been eliminated to the extent practicable, the Court determines that the Pontiac School District has achieved unitary status,[12] and the District should be released from the constraints of the Court's injunctive orders.

The fact that the District could achieve some different level of compliance with a

10. The District, of course, is free to implement this plan on its own without judicial supervision.

11. As the Fourth Circuit found in *Riddick v. School Board of the City of Norfolk,* 784 F.2d 521 (4th Cir.1986), *cert. denied,* 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986), where changes in demographics and the elimination of cross-town busing due to financial constraints resulted in the student population in more than half of the district's schools becoming 70%—95% single race schools, absent a showing of intentional discrimination, the district court's determination 15 years earlier that all vestiges of past segregation had been eliminated and unitary status established was not abrogated.

12. While "unitary status" generally presupposes a finding pursuant to *Green v. School Bd. of New Kent County,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716, that faculty, staff, transportation, extracurricular activities and facilities are racially balanced, in this case, transportation, extracurricular activities and facilities were never deemed by the Court to be segregated and no evidence has been submitted to establish that that was ever the case. Furthermore, the Supreme Court has emphasized that the *Green* factors were not intended to be a rigid framework. *See Freeman v. Pitts, supra,* 112 S.Ct. at 1446. Under these circumstances, the Court finds it unnecessary to address these matters.

modification of the Court's existing order does not mean the Court should modify the order and retain jurisdiction. To the contrary, the fact that the District is requesting modification demonstrates the cost burdens and difficulties faced by a school district in remaining under, and complying with, a continuing injunction. As noted, the involvement of Federal courts in the governance of our local schools was always intended to be limited and circumscribed, and, it is only where supervision or monitoring is required by continuing constitutional violation that the Court should maintain a continuing role. Here that is not the case. Rather, it is only because the Pontiac School District believes that some different degree of compliance with the student assignment standards set forth in the original decree in this matter would be possible—and perhaps even desirable—that the District has requested that the Court retain jurisdiction over this matter.[13] But the District can accomplish its objectives without the Court's involvement. Therefore, guided by the authorities discussed above, the Court declines the invitation to retain jurisdiction.

### CONCLUSION

For all of the reasons stated above in this Opinion and Order, the Court finds that the Pontiac School District has complied in good faith with the desegregation decree since it was entered more than 25 years ago, and that the vestiges of past discrimination have been eliminated to the extent practicable. Therefore, the Court determines that it must relinquish jurisdiction over this matter and dissolve the permanent injunction entered by the Court in 1974.

Accordingly,

---

**13.** As the District Court for the Western District of North Carolina stated in dissolving the injunctive decree entered 30 years earlier and in *Swann v. Charlotte–Mecklenburg,* "A court should not remain involved [in a desegregation action] indefinitely merely because some

IT IS HEREBY ORDERED that the permanent injunction entered by the Court on October 9, 1974 be, and hereby is, DISSOLVED. Accordingly,

IT IS FURTHER ORDERED that the Court's jurisdiction over this matter is hereby TERMINATED.

further degree of compliance with [student] assignment standards is conceivable." *Capacchione, et al. v. Charlotte–Mecklenburg Schools,* 57 F.Supp.2d 228, 255 (W.D.N.C. 1999).